**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | **No. 1:24-cr-10189-AK** |
| | § | |
| **v.** | § | |
| | § | |
| **MANPREET KOHLI, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT KOHLI'S MOTION TO DISMISS THE INDICTMENT

Eric S. Rosen
DYNAMIS LLP
175 Federal Street
Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

*Attorney for Plaintiff*

## TABLE OF CONTENTS

**I. PRELIMINARY STATEMENT** ........ **1**

**II. FACTUAL BACKGROUND** ........ **2**

**III. ARGUMENT** ........ **5**

**A. Legal Standard on a Motion to Dismiss** ........ **5**

**B. The Indictment fails to allege the existence of a "money transmission business" requiring FINCEN regulation.** ........ **6**

1. The complex statutory scheme for "unlicensed money transmitting businesses". ........ 6

2. The Indictment here fails to allege the operation of an unlicensed money transmission business. ........ 8

3. The Indictment fails to allege that a Saitama token is a "security" and further fails to allege the elements of "market manipulation." ........ 11

4. The Indictment fails to plead wire fraud as to Mr. Kohli ........ 16

5. Mr. Kohli can challenge the sufficiency of the Indictment prior to extradition. ........ 19

**IV. CONCLUSION** ........ **20**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bascuñán v. Elsaca*
927 F.3d (2d Cir. 2019) .................... 16

*Hamling v. United States*,
418 U.S. 87 (1974) .................... 5

*Hughes v. United States*,
340 F.2d 609 (1st Cir. 1965).................... 6

*In re January 2021 Short Squeeze Trading Litigation*,
620 F. Supp. 3d 1231 (S.D. Fl. 2022).................... 13

*Kousisis v. United States*,
605 U.S. 114 (2025) .................... 16

*Risley v. Uniswap*,
2025 WL 615185 (2d Cir. Feb. 26, 2025) .................... 12

*Russell v. United States*,
369 U.S. 759 (1962) .................... 5

*United States v. Barker Steel Co.*,
985 F.2d 1123 (1st Cir. 1993).................... 16

*United States v. Baugh*,
597 F. Supp. 3d 502 (D. Mass. 2022).................... 15

*United States v. Bescond*,
24 F.4th 759 (2d Cir. 2021) .................... 1, 18, 19

*United States v. Eisenberg*,
784 F. Sup. 3d 579 (S.D.N.Y. 2025) .................... 15

*United States v. Elbaz*,
52 F.4th 593 (4th Cir. 2022) ........ 16

*United States v. Foley*,
783 F.3d 7 (1st Cir. 2015) ........ 16

*United States v. Freedman*,
147 F.4th 1 (1st Cir. 2025) ........ 7, 8, 10

*United States v. Hussain*,
972 F.3d 1138 (9th Cir. 2020) ........ 16

*United States v. Kim*,
2025 WL 2597397 (N.D. Cal. Sept. 8 2025) ........ 8

*United States v. McLellan*,
959 F.3d 442 (1st Cir. 2020) ........ 16

*United States v. Napout*,
963 F.3d 163 (2d Cir. 2020) ........ 16

*United States v. Salinas*,
373 F.3d 161 (1st Cir. 2004) ........ 15

*United States v. Savarese*,
686 F.3d 1 (1st Cir. 2012) ........ 5

*United States v. Troy*,
618 F.3d 27 (1st Cir. 2010) ........ 6

*United States v. Vilar*,
729 F.3d 62 (2d Cir. 2013) ........ 14

**Statutes**

15 U.S.C. §78aa(a) ........ 15

15 U.S.C. §78c(a)(17) ........ 14

15 U.S.C. § 78c(a)(10) ........ 12

15 U.S.C. §§ 78i(a)(2) and 78ff(a) ........ 11, 13

18 U.S.C. §1343 ........ 16

18 U.S.C. § 1960(a) ........ 6

18 U.S.C. §1960(b)(1)(b)........................................................................................... 6, 7

18 U.S.C. § 371............................................................................................................. 16

18 U.S.C. § 1960(b)(1)(A) and (B)................................................................................. 10

31 U.S.C. § 5330(d)...................................................................................................... 6, 7

**Rules**

Fed. R. Crim. P. 12 ........................................................................................................ 5

Fed. R. Crim. P. 7 ...................................................................................................... 5, 17

**Regulations**

31 CFR § 1010.100(ff)............................................................................................... 7, 10

## I. PRELIMINARY STATEMENT

The bare-bones Indictment filed against Manpreet Kohli fails to allege offenses against him and therefore must be dismissed. Count One is comprised of a three-prong conspiracy—securities market manipulation, unlicensed money transmission, and wire fraud. All three objects are insufficiently pled. Other than labeling Saitama a security, there are no allegations that the Saitama Token *is* a security. And, the charged substantive count of market manipulation (Count Two) took place entirely within the United Kingdom. The unlicensed money transmission object of the conspiracy cannot be sustained because it applies only to the transmission of money or funds. The Government, as described, alleges that Saitama is a *security*, which is not swept up into the unlicensed money transmission dragnet. The wire fraud prong of the conspiracy too should be dismissed. The Indictment's allegations are so vague and nebulous—the majority of the allegations are simply descriptions of categories of statements made at unknown times—that Kohli cannot begin to understand the actual charges against him, let alone defend himself at trial. And as for the group text message exchange that comprises the entirety of Count Seven, Kohli's innocuous comment that the U.S. is easiest to get into "trouble," cannot possibly form the "essential conduct" needed for wire fraud. Finally, Kohli's current location in the United Kingdom presents no barrier to him filing this motion now. Per the Second Circuit's decision in *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021), Kohli—a resident of the United Kingdom who allegedly committed his

crimes entirely from that location—is not a "fugitive" (as he did not flee) and therefore cannot be precluded from accessing this Court based on the fugitive disentitlement doctrine.

## II. FACTUAL BACKGROUND

Manpreet Kohli is an Indian citizen living in the United Kingdom "[a]t all times relevant to this Superseding Indictment." *See* Dkt. 10 ¶.[1] The Indictment alleges that Kohli, together with Nam Tran, Haroon Mohsini, Russell Armand, Max Hernandez and Vy Pham, were leaders of the "Saitama business" as featured on the "company's website." ¶9. Saitama, according to the Indictment, is a "cryptocurrency token operated on the Ethereum blockchain." ¶8. Saitama "purported to create multiple products that could be used with the Saitama Token, "including the SaitaMask cryptocurrency exchange, the SaitaMaker non-fungible token ("NFT") platform, the SaitaRealty real estate investment platform and the SaitaRealty cryptocurrency token, and SaitaMarket, among others." *Id*. The Indictment deems the "Saitama Token" to be a "security that at its peak had a market capitalization of $7.5 billion."

The Indictment describes "[v]irtual currency" as a digital asset or digital representation of value" that can be traded online and is not "backed or insured by a central bank and its value may or may not be tied to or secured by a fixed asset." ¶12. Crypto is a "subset of virtual currency that utilizes "blockchain technology." The Secretary of the Treasury requires that "[a]ny person who owns or controls a money transmitting business shall register the business" with the Treasury, and further, *"in certain instances*" a crypto exchange—"an electronic forum that facilitates the purchase, sale and exchange of cryptocurrencies"—is a "money transmitting business." ¶13.

The Indictment claims, in part, that Kohli, together with others, conspired from June 2021 to 2023 to "artificially inflate the price of Saitama Tokens through manipulative trading, false and

[1] For ease of reference, the term "Indictment" refers to the Superseding Indictment filed at Dkt. 10. All paragraph references are to the Superseding Indictment.

misleading statements, and *the operating of an unlicensed cryptocurrency exchange*, and to profit by selling Saitama Tokens." ¶14. Specifically, Kohli and others engaged in manipulative trading of Saitama to "create actual or apparent trading volume, thereby inducing others to trade Saitama Tokens, and inflate" their price. ¶16(a). In addition, Kohli solicited people to buy Saitama tokens, made materially false statements about Saitama, operated an "unlicensed money transmitting business that allowed users to buy and sell Saitama Tokens and other cryptocurrencies," sold Saitama Tokens for a profit, and allegedly moved operations "offshore." ¶16(b)-(f).

The Indictment sets forth just a few specific allegations regarding what Kohli and his co-conspirators are alleged to have done. The Indictment describes a purported text message exchange occurring on July 3, 2021—close in time to the creation of the Token—by which the alleged coconspirators engaged in a conversation about coordinating purchases of Saitama. ¶20. Other than a single screenshot of a proposed purchase of just over $100 of Saitama, there are no *actual* trades that are described. ¶20(f). The Indictment further claims that the conspirators paid ZM Quant and Gotbit to buy and sell Saitama Tokens on "multiple cryptocurrency exchanges," which the Indictment alleges "artificially" inflated the "apparent trading volume of Saitama." ¶22. No details are provided.

The Indictment alleges that the conspirators made false and misleading statements. ¶23-29. There is not a single false statement that is alleged to be made by Kohli. Rather, the only statements ascribed to individuals are statements made by Armand and Tran about "buying more" Saitama. ¶29. The other statements revolve around allegations that conspirators (in general) "continuously access[ed] the DEXTolls webpage" to choose Saitama as a favorite, promoting Saitama on Twitter by referencing Saitama's rating on DEXTools (¶27), and promoting Saitama on its own website through falsities in its "whitepaper" and by misleading people about the way the token was coded.

¶28. These statements are not subscribed to any particular individual, and there are no allegations that Kohli authored any statements, coded tokens, wrote the whitepaper, or had access to the website for editing purposes.

With respect to the "unlicensed money transmitting business," the Indictment does not allege that any specific "money" was transmitted through an unlicensed exchange. Rather, the two examples in the Indictment are that the website advertised that Saitama in August 2021 had created a "one stop shop where you can connect your payment system of choice and be able to buy, sell, swap, transfer and do whatever you need with any coin." ¶31. This obviously, is not accurate, because in the very next paragraph the Indictment further alleges that it was not until January 18, *2022*, the exchange became public and "allowed users to exchange Saitama Tokens with other cryptocurrencies." ¶32. There are no allegations concerning what volume of crypto was exchanged, whether the exchange was a custodial exchange or a DeFi exchange, what crypto-assets were exchanged, whether the exchanged crypto was a "security" (like Saitama) or money, or whether the people who purportedly used the exchange were based in the United States.

Finally, the Indictment alleges that the conspirators engaged in efforts to avoid U.S. Regulators. ¶¶33-38. Specifically, the Indictment contends that Kohli, who lived in the UK and is not a US citizen, failed to report his "proceeds" to the United States "Internal Revenue Service." ¶34. There are no allegations concerning *why* Kohli would have to do so. It cannot be "avoidance" for someone who has no obligation to pay taxes to a foreign government to not report their income to that foreign government. Further, the Indictment claims that Kohli wrote in a private Telegram chat room on February 14, 2022 that the "US is easiest to get in trouble lol," and that on July 1, 2022, Saitama announced on Twitter that it would "migrate operations to Dubai, UAE." ¶¶34, 38. The Indictment references two communications between Armand and Hernandez discussing

"potential lawsuits" and the SEC, but does not say that any other individuals were included on those messages or even knew about them.

The Indictment charges Kohli with conspiracy to participate in a three-pronged conspiracy: market manipulation of securities, operating an unlicensed money transmission business, and wire fraud." ¶40. In addition, Kohli is charged in Count Two with market manipulation for alleged trades on July 3, 2021 (¶42), and in Count Seven with wire fraud for sending a group chat message on February 14, 2022 that said "US is easiest to get in trouble lol." ¶48. Although the Indictment claims that Hernandez, located in Massachusetts, was a member of this group chat, the Indictment does not allege that Kohli directed that message to him or to the United States.

## III. <u>ARGUMENT</u>

### A. Legal Standard on a Motion to Dismiss

Rule 12 of the Federal Rules of Criminal Procedure allows a defendant to move to dismiss an indictment for lack of specificity or for failure to state an offense, amongst other defects. *See* Fed. R. Crim. P. 12(b)(3)(B)(iii) and (v).

It is axiomatic that Fed. R. Crim. P 7 requires an indictment to be a "plain, concise and definite written statement of *the essential facts* constituting the offense charged. *See also Hamling v. United States*, 418 U.S. 87, 117 (1974) (valid Indictment contains "the elements of the offense charged and fairly informs the defendant of the charge against which he must defend, and … enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."). In addition, the Indictment *must* be "accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged." *See United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012).

It is insufficient for the Government to employ the generic terms of a statute to properly state and offense. *See Russell v. United States*, 369 U.S. 759, 765 (1962) ("It is an elementary principle of criminal pleading, that where the definition of an offence . . . includes generic terms, it is not sufficient that the indictment shall charge the offence in the same generic terms . . . but it must state the species,—it must descend to particulars." (citation omitted)); *Hughes v. United States*, 340 F.2d 609, 610 (1st Cir. 1965) ("[I]t is insufficient to charge simply in the language of the statute if the statute itself failed to set forth expressly, fully, and clearly all elements necessary to constitute the offense." (citation omitted)). Rather, although the "statutory language may be used in the indictment to describe the offense," the Indictment "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010).

**B. The Indictment fails to allege the existence of a "money transmission business" requiring FINCEN regulation.**

Count One's conspiracy charges Kohli and others, by operating Saitama, with knowingly conducting an "unlicensed money transmitting business" that failed to comply with the "money transmitting business registration requirements under Title 31, United States code, Section 5330" in violation of Title 18, United States Code, §§ 1960(a) and (b)(1)(B). The Indictment fails to allege both an unlicensed money transmitting business *and* any obligation to register with FinCEN.

*1. The complex statutory scheme for "unlicensed money transmitting businesses".*

Section 1960 provides that any person who controls, manages or supervises an "unlicensed money transmitting business" shall be imprisoned for not more than five years. The term "unlicensed money transmitting business" is a "money transmitting business," as relevant

here, that "fails to comply with the money transmitting business registration requirements under section 5330 of title 31." 18 U.S.C. §1960(b)(1)(b).

Although §1960 does not define a money transmitting business, other regulations do. A "money transmitting business" is any business that "(A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; (B) is required to file reports under section 5313; and (C) is not a depository institution (as defined in section 5313(g) )." 31 U.S.C. § 5330(d)1).

Finally, money transmission services refer to "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means." Any "means" includes, "but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or an informal value transfer system." 31 CFR § 1010.100(ff). Last, Section 5330 of the Bank Security Act requires "[a]ny person who owns or controls a money transmitting business" to register the business, which must occur no later than *180-days* after the "date on which the business is established." 31 § 5330.

In sum, to qualify as an unlicensed money transmitting business under 18 U.S.C. § 1960(b)(1)(B), a business, at least substantially within the United States and operating for more than 180-days, must first engage in the "transmission of currency, funds or value that substitutes for currency," and that currency must travel "from one person" to "another location or person by any means." *See United States v. Freedman*, 147 F.4th 1, 11-12 (1st Cir. 2025).

*2. The Indictment here fails to allege the operation of an unlicensed money transmission business.*

The First Circuit recently analyzed the meaning of the term "funds" in the unlicensed money transmission statutory regime. *See Freedman*, 147 F.4th a 13-15. The Court defined funds as "money" or "something generally accepted as a medium of exchange, a measure of value, or a means of payment." *Id.* at 13. Building off this, the Court found that "bitcoin falls within the plan meaning of 'funds' and that Section 1960 and 5330 therefore capture businesses that sell *bitcoin* to customers in exchange for government-issued currency." *Id.* The Court agreed with numerous other courts "because bitcoin can be and is used as a currency to make sales and purchases and, therefore, nicely fits the definition of 'funds.'" *Id.* The nature of bitcoin—an entirely decentralized coin that is the oldest and largest cryptocurrency by asset size—made it "money."

This case is not about Bitcoin. Rather, the coin at issue—the one coin that Defendants allegedly transmitted—is Saitama. And the Government defines Saitama in the Indictment as a "security," which Bitcoin is not. *See, e.g., United States v. Kim*, 2025 WL 2597397, *3 (N.D. Cal. Sept. 8 2025) (explaining that Bitcoin is not a security). There is nothing in the money transmission regulations that provide that the transmission of *securities*—which are not money or funds—is regulated by the statute. Moreover, *Freedman* precludes such an expansion of the definition of "money" because the First Circuit specifically ruled that Bitcoin was "money" because it is a currency used to "make sales and purchases." There is nothing within the

Indictment indicating that the Saitama coin is used by anyone to "make sales and purchases" of ordinary goods. Thus, because the Indictment does not allege that Saitama qualifies as money or funds, the money transmission prong of the conspiracy must be dismissed.

Further mandating the dismissal of the money transmission charge is that the Indictment is bereft of detailed allegations regarding what exactly comprised this alleged "money transmitting business."[2] The only concrete allegation of actual money transmission is in ¶32, which alleges that the "cryptocurrency exchange allowed users to exchange Saitama Tokens with other cryptocurrencies." But that allegation is insufficient to allege a money transmission business for multiple reasons.

*First*, the Indictment does not say which cryptocurrencies were sent to be exchanged for Saitama Tokens. The Indictment does not even claim that *any* crypto that qualifies as money or funds was ever sent to the Saitama Exchange. To the contrary, the Indictment alleges that *only* in "certain instances" does a cryptocurrency exchange constitute a "money transmitting business" (¶13), and then the Indictment provides no indication, at all, as to why the Saitama exchange falls into one of those "certain instances" making it into a money transmission business.

*Second*, even if some crypto was sent to the Saitama Exchange qualifies as money—there are no allegations to that effect—to be exchanged for Saitama tokens, that still is insufficient to qualify Saitama exchange as a money transmission business. This is because money transmission services "means the acceptance of currency, funds, or other value that substitutes for currency *from one person* and the transmission of currency, funds, or other value that substitutes for

---

[2] The failure to include any concrete allegations regarding the money transmission exchange is not surprising. There was no "exchange" as commonly-thought. Saitama did not hold individual's crypto and facilitate swaps. Rather, Saitama created a DeFi non-custodial wallet that was effectively a software package that facilitated transactions between others. This software was riddled with bugs and shut down shortly after it launched because it continuously crashed.

currency *to another location or person* by any means." As the words of the statute make clear, funds or money must come into the exchange and funds or money must got out. Here, the Indictment makes clear that, *at most*, the transmission of money was only one way. People could, allegedly, send crypto that potentially qualify as money to be exchanged for a security (Saitama). Or people could send a security (Saitama) that would be exchanged for crypto (that also could potentially qualify as money). Because, by the Government's own pleadings, the Indictment fails to allege that funds were transmitted from one person to another through an exchange, the Indictment fails to allege an offense. Indeed, this is precisely why the litany of cases cited by the First Circuit in *Freeman*, 147 F.4th at 13, concern the transmission of Bitcoin or the exchange of Bitcoin for fiat currency. None of them concern what is alleged here, which is the exchange of an unspecified crypto for a security (Saitama).

The Government is trying to fit a square peg into a round hole. But it is precisely for this reason that the Department of Justice has directed prosecutors not to "not charge regulatory violations in cases involving digital assets," including charges of "unlicensed money transmitting under 18 U.S.C. § 1960(b)(1)(A) and (B)."[3] While this guidance is not force of law, certainly the DOJ's own interpretation of the money transmission laws should inform this Court's decision as to whether the Indictment adequately alleges an offense.[4]

---

[3] April 7, 2025, Deputy Attorney General Todd Blanche memorandum to Department of Justice ("DOJ") employees titled "Ending Regulation By Prosecution," n.2, at 1, attached hereto as Exhibit A at 6-9.

[4] In multiple already charged crypto cases the Government has dropped the same unlicensed money transmission charges that the Government now tries to bring against Kohli. *See, e.g., United States v. Storm*, 23-CR-00430 (S.D.N.Y.) (Dkt. 144) ("Letter re: Charges in Superseding Indictment"); *see also United States v. Rodriguez*, 24-CR-82 (S.D.N.Y) (Dkt. 109, 144) (third superseding Indictment dropped 18 U.S.C. §1960(B)).

Last, there are two additional reasons why this charge must be dismissed. There are no allegations that any money was transmitted in interstate or foreign commerce. Specifically, there are no allegations that any money originated in the United States as part of the exchange of funds. Rather, the Indictment's sole allegation is that the exchange "allowed users to exchange Saitama Tokens with other cryptocurrencies." The Indictment contains no information as to *where* the exchange is located. And, to the extent that such an exchange was entirely international, of course the money transmission laws do not apply. *See* 31 CFR § 1010.100(ff) (registration under FinCEN applies only *to exchanges* "wholly or in substantial part within the United States"). That an individual operating an exchange in the U.S. is immaterial; the exchange itself must be in the United States, at least in substantial part.

In addition, the money transmission statute only requires registration with FinCEN 180-days after a business is established. Here, as alleged, the exchange did not begin to operate until January 18, 2022 (¶32). There are no allegations that it lasted more than 180-days (in fact it did not), and moreover, the Indictment specifically alleges that on July 1, 2022, the Saitama business (undefined by the Indictment) moved entirely overseas (to Dubai), which was within the 180-day registration period.[5] ¶38. A domestic exchange that does not have a continuous business for more than 180-days does not have to register with FINCEN. For this reason too, the Indictment fails.

**3. The Indictment fails to allege that a Saitama token is a "security" and further fails to allege the elements of "market manipulation."**

Mr. Kohli is charged with securities fraud and conspiracy to commit securities fraud, albeit market manipulation in violation of Title 15 U.S.C. §§ 78i(a)(2) and 78ff(a)). However,

---

[5] *See* https://www.fincen.gov/resources/money-services-business-msb-registration#:~:text=The%20form%2C%20Registration%20of%20Money,be%20renewed%20every%20two%20years. ("FinCEN Form 107 must be completed and signed by the owner or controlling person and filed within 180 days after the date on which the MSB is established.").

other than a generic statement that Saitama Token is a "security," the Indictment provides no "essential facts" indicating that Saitama Token actually *was* a security. Accordingly, because the Indictment fails to plead that Saitama was a security, all securities charges (Counts One and Two) must be dismissed.

§§ 78i(a)(2) makes it unlawful to "effect, alone or with 1 or more other persons, a series of transactions in *any security* registered on a national securities exchange, *any security* not so registered, or in connection with any *security*-based swap or *security*-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

A security, in turn, is defined under 15 U.S.C. § 78c(a)(10) as:

> The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

There are no facts pled indicating that Saitama Tokens fall under this required definition. Saitama is not a stock or bond, it is not traded on any U.S. exchange, it is not an instrument "commonly known as a security," and it is not a certificate of deposit. The only parts of the

statute that could, as a matter of law, even apply to Saitama are the "investment contract" or "profit-sharing agreement" prongs of the definition. But there are no facts, *at all*, indicating that Saitama Tokens, at the time of the alleged manipulation, were investment contracts or part of profit-sharing agreements. To the contrary, the Indictment seems to imply that the Token is not a security as it alleges that the value of crypto "may or may not be tied to or secured by a fixed asset," ¶12, and further, the only actual trade mentioned in the Indictment—at ¶20(f)—was a trade on the Uniswap platform. Uniswap is a *decentralized* exchange.[6] As publicly reported, the SEC did open an investigation into Uniswap as an unregulated securities exchange, but then dropped its investigation, confirming that Uniswap does not facilitate the exchange of securities.[7] *See also Risley v. Uniswap*, 2025 WL 615185 (2d Cir. Feb. 26, 2025) (affirming dismissal of Securities and Exchange Act claims against Uniswap on the basis that the decentralized exchange did not facilitate securities transactions).

The Government's failure to allege that Saitama is a security stands in stark contrast to other Government indictments concerning crypto-tokens. In *United States v. Lee* (D. Md. 24-cr-00021), the Indictment, attached hereto as Exhibit B, acknowledged that securities include "investment contracts." The bulk of the Indictment then provided examples of how the crypto at issue (Hyperfund) qualified as an investment contract. In *United States v. Manor*, 20-cr-51-SRC (D.N.J.), attached hereto as Exhibit C, the Indictment also alleged that "investment contracts" were securities, and then devoted significant detail to explain how the tokens at issue were investments. As a final example, *United States v. Zaslavskiy*, 17-cr-647 (E.D.N.Y. 2017), attached hereto as Exhibit D, the indictment included a definition of the term "investment

[6] *See* https://app.uniswap.org/

[7] https://www.defieducationfund.org/risley-v-uniswap-ruling-sec-drops-investigations-and-enforcement-actions-senate-banking-committee-hearing/

contract" and then described, in detail, how the crypto at issue was such a contract because it was "backed by real estate investments." Here, there are no such details or even explanation as to how Saitama Token—which the Government also uses for unlicensed *money* transmission charges—is a security. For this reason alone, the failure to include *anything* (let alone "essential facts") indicating that Saitama is a security, the Indictment must be dismissed.

In addition, the Indictment fails to allege all the elements of market manipulation, as charged under 15 U.S.C. §78i(a)(2). The gravamen of this charge is *not* material misrepresentations, but rather actual trades that artificially moved the market. There are four elements to this crime: 1) a series of transactions in a security creating actual or apparent trading in that security or raising or depressing the price of that security, 2) carried out with scienter (willfulness), 3) for the purpose of inducing the security's sale or purchase by others, and 4) and the trading affected the security's purchase or selling price. *See In re January 2021 Short Squeeze Trading Litigation*, 620 F. Supp. 3d 1231, 1248 (S.D. Fl. 2022). Here, the Indictment details a single text message conversation on July 3, 2021 between a number of alleged co-conspirators, including Kohli. ¶20. While the conversation certainly discusses coordinated micro-purchases of Saitama, the Indictment fails to allege any actual trades except for a single screenshot showing a "proposed purchase of Saitama tokens." ¶20(f). The Indictment does not indicate what specific trades were placed, or even whether the trading affected the security's purchase or selling price. While the Indictment plainly wants us to infer that a series of transactions *did* occur, the Indictment must allege a specific series of transactions that *created* "actual or apparent trading in that security" or which raised or depressed the price of that security. *Discussions* about trading, while they can certainly shed light on a person's intent, do

not demonstrate that a series of trades occurred that affected the security's price. This deficiency means that Count Two of the Indictment must be dismissed.

Last, the market manipulation statute requires an Indictment to allege both that Kohli used the means and instrumentalities of interstate commerce (an element of the offense) and also that, for venue purposes, conducted transactions in the District of Massachusetts. The Indictment makes clear that Mr. Kohli lived in the United Kingdom. ¶1. The Indictment does *not* allege that any of his trades took place in the United States. *See United States v. Vilar*, 729 F.3d 62, 74-75 (2d Cir. 2013) (Securities Act does not apply extraterritorially). Rather, the Indictment alleges that Mr. Kohli used the Uniswap decentralized exchange to place trades, meaning that there was *no* centralized exchange whereby a trade occurred. ¶20(f). Thus, the Government has alleged no facts indicating that Mr. Kohli's trades occurred between different states or between "any foreign country and any State." 15 U.S.C. §78c(a)(17). While the Indictment alleges communications amongst co-conspirators—some of whom were presumably located in the United States—because the gravemen of this charge is the *trades* undertaken by Mr. Kohli, communications alone are insufficient. This mandates the dismissal of both market manipulation charges (Counts 1 and 2).[8]

For these same reasons, the Government fails to include any allegations supporting venue for the substantive securities count against Mr. Kohli (or even the conspiracy count). Under Title 15, venue is appropriate in a criminal case in the district wherein "any act or transaction constituting the violation occurred." 15 U.S.C. §78aa(a). Here, the acts or transactions "constituting the violation" were the trades themselves. *See, e.g., United States v. Eisenberg*, 784 F. Sup. 3d 579 (S.D.N.Y. 2025) (in similar case market manipulation case under the

[8] While Count One is a conspiracy count, Count Two is charged just as to Kohli and no other individuals.

Commodities Exchange Act court granted Rule 29 on market manipulation count because the "essential conduct … is the trading"); *see also United States v. Salinas*, 373 F.3d 161, 165 (1st Cir. 2004) (discussing venue and providing that courts must "look at the essential conduct elements of the offense in order to ascertain the adequacy of venue"). The Indictment firmly alleges that Mr. Kohli lived in London, United Kingdom. There are no allegations that he traded, at all, in the District of Massachusetts. This defect is apparent from the face of the Indictment, thereby allowing this Court to dismiss Count Two on venue grounds. *See United States v. Baugh*, 597 F. Supp. 3d 502, 508 (D. Mass. 2022) (explaining that motion to dismiss indictment on venue grounds can be granted if the defect "is evident on the face of the indictment").

**4. The Indictment fails to plead wire fraud as to Mr. Kohli**

The wire fraud prong of the conspiracy also must be dismissed. The barebones description of "misrepresentations" lacks needed specificity and fails to allege a crime. Because of this, the wire fraud conspiracy must be dismissed pursuant to Rules 12(b)(3)(B)(iii) and (v).

The elements of wire fraud under 18 U.S.C. §1343 include "(1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of interstate wires in furtherance of the scheme." *United States v. Foley*, 783 F.3d 7, 13 (1st Cir. 2015) (citation omitted). Further, 18 U.S.C. § 371 requires the Indictment to allege "an agreement, the unlawful objective of the agreement, and an overt act in furtherance of the agreement." *See United States v. Barker Steel Co*., 985 F.2d 1123, 1127-28 (1st Cir. 1993).

Two other principles are important to this analysis. First, the focus of the wire fraud statute for purposes of extraterritoriality analysis is the use of a wire in furtherance of a scheme to defraud. *See, e.g., United States v. McLellan*, 959 F.3d 442, 469 (1st Cir. 2020); *Bascuñán v.*

*Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019); *United States v. Elbaz*, 52 F.4th 593, 603 (4th Cir. 2022); *United States v. Hussain*, 972 F.3d 1138, 1145 (9th Cir. 2020). And, the use of these domestic wires must be essential rather than incidental to the scheme. *See United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020). Second, any misrepresentations or omissions must be material, meaning, as the Government argued in *Kousisis v. United States*, 605 U.S. 114, 131 (2025), that the misrepresentation must go to the "very essence" of the parties' bargain. *Kousisis* also determined that federal fraud laws only punish the "deception-induced deprivation of property," meaning that there must actually be a victim of the fraud. *Id.* at 126-128.

With these principles in mind, we turn to the allegations in the Indictment, which, as pertains to wire fraud, are exceedingly thin. *See* ¶¶23-29. The Indictment does not allege a single false statement made by Kohli. Instead, the Indictment lumps the defendants together and accuses them all of the same, generic conduct. *All* defendants, apparently, "manipulated DEXTools." ¶26. *All* defendants apparently worked on the Saitama website. Other than stating that conduct began in mid-2021, there are no specific allegations as to when the DEXTools were manipulated, or when the website was larded with false statements or even when the defendants solicited donations to pay for business expenses. ¶¶24-25. With no specificity as to who did what, where and when, Kohli cannot possibly defend himself at trial or even prepare for trial.

In addition to the lack of specificity, the Indictment is clearly missing the "essential facts" of the elements of the offense, as required by Fed. R. Crim. Pro. 7. Other than using the word "material," the Indictment fails to explain why any of the alleged misstatements were material. The Indictment contains no allegations that any victims cared or reviewed DEXTools. Likewise, there are no allegations as to why anyone was concerned about whether a whitepaper had "been reviewed by regulators." The website did not claim, for example, that Saitama had

been *approved* by regulators, only that the whitepaper had been sent to regulators. None of the "misrepresentations" can be deemed to be an essential element of a "bargain," and therefore, under *Kousisis*, they cannot be material.

Because of the lack of specificity, there are no non-generic allegations that Kohli had the intent to join a wire fraud conspiracy. Rather, the group pleading—bereft of any details as to what Kohli actually did—confirms only that he did *not* join a conspiracy. Likewise, to the extent that Kohli had a specific intent to defraud a victim, as required by *Kousisis*, all allegations of that "intent" are missing from the Indictment.

Last, the lack of specificity makes it impossible to tell whether the alleged conspiracy that Kohli joined was domestic or foreign. All the allegations in ¶¶23-29 are generic; it is unknown whether any wires that Kohli sent or received were sent to or from the United States or were sent as essential conduct as part of a scheme to defraud. The sole statement allegedly uttered by Kohli, in Count Seven, is part of an *internal* group chat by which he wrote: "US is easiest to get in trouble lol." Not only was that not a material misrepresentation—the Government does not contend it was false or induced a victim to part with money—it is also not essential conduct part of a scheme to defraud, which is required. If anything, the message means that Kohli wished to *avoid* the United States entirely because of regulatory concerns. ¶¶35-38. The wire fraud conspiracy needs more, and Count Seven needs more. The Indictment needs to properly allege the various elements of the offense. The Indictment needs to set forth the "essential facts constituting the offense charged," which it does not. And the Indictment must allege that the group "lol" text message is essential conduct committed on American soil. This Indictment falls far short in every respect. For all these reasons, the wire fraud conspiracy and Count Seven must be dismissed.

**5. Mr. Kohli can challenge the sufficiency of the Indictment prior to extradition.**

As the Court is aware, Mr. Kholi has not yet been extradited from the United Kingdom to the United States. He may never be. However, that does not bar Mr. Kohli from moving this Court to dismiss the Indictment prior to his extradition (to the extent that occurs).

In *United States v. Bescond*, 24 F.4th 759 (2d Cir. 2021), the Second Circuit considered the issue of whether a resident and citizen of France was a fugitive for the purposes of assessing whether the fugitive disentitlement doctrine forbid her from challenging her indictment prior to traveling to the United States. The Second Circuit determined that a fugitive is someone "who flees or escapes" or takes "some action" to "distance herself from the United States or frustrate arrest." Because *Bescond* wanted to "simply remain[ ] at home, as her home country permits her to do," she was not a fugitive. The exact same circumstances apply here. Kohli did not flee the United States. Rather, at all times he lived in the United Kingdom, and he simply wants to remain at home, just like Bescond. He is under no obligation to travel to the United States. Thus, the Second Circuit ruled, Bescond could challenge the sufficiency and reach of the Indictment prior to her arrival, and Mr. Kohli should be allowed to do the same.

In addition, although the District Court ruled that the fugitive disentitlement doctrine prohibited her from challenging the Indictment, the Second Circuit allowed *Bescond* to immediately appeal under the "collateral order doctrine." *Id.* at 765. The Second Circuit held that because disentitlement "heavily burdens Bescond's exercise of the due process right to defend herself in court," it was a "most severe" sanction that was effectively unreviewable post-judgment. While an appeal of this Court's decision on the fugitive disentitlement issue is not yet ripe, the defense respectfully submits that the Second Circuit's rare decision to allow an appeal from a collateral order demonstrates just how important it is to allow overseas defendants the right to

defend themselves against a far-reaching government. That right to mount a defense is even more critical given that the evidence as set forth in the bare-bones Indictment is hardly overwhelming, and this Court granted the Government's motion to stay the SEC case, preventing Kohli from challenging *that* case. Mr. Kohli, like any criminal defendant, must be given an opportunity to defend himself.[9]

## IV. CONCLUSION

For all these reasons, Kohli respectfully requests that this Court allow Mr. Kohli, a resident of the United Kingdom "at all relevant times," challenge the Government's case against him. To be hauled into Boston, thousands of miles away from his home in the United Kingdom, on the basis of what appears to be a single message—the "US is easiest to get in trouble lol"—certainly implicates far-reaching global concerns. In addition, once the merits of this case are challenged, it is clear that the entire Indictment against Kohli must be dismissed.

[9] The issues raised in *Bescond* and its progeny have not yet been considered by the First Circuit.

Dated: November 6, 2025

Respectfully submitted,

*/s/ Eric S. Rosen*
Eric S. Rosen
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

## **CERTIFICATE OF SERVICE AND CONFERENCE**

I hereby certify that on November 7, 2025, a true and correct copy of the foregoing document was served by e-filing upon counsel of record. Further, the Government does not agree to dismiss the Indictment.

*/s/ Eric S. Rosen*
Eric S. Rosen
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com