UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                              |   |                          |
|------------------------------|---|--------------------------|
| UNITED STATES OF AMERICA     | ) |                          |
|                              | ) |                          |
| v.                           | ) | Crim. No. 1:24-10189-AK  |
|                              | ) |                          |
| (1) MANPREET KOHLI and       | ) |                          |
| (3) HAROON MOHSINI,          | ) |                          |
|                              | ) |                          |
| Defendants                   | ) |                          |

## **GOVERNMENT'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

The government respectfully submits this opposition to the motion to dismiss filed by defendant Manpreet Kohli ("Motion," Dkt. 55), which co-defendant Haroon Mohsini has moved to join in substantial part (Dkt. 56).[1]

The superseding indictment ("Indictment," Dkt. 10) charges the defendants with conspiring with each other and others to artificially inflate the price of the cryptocurrency they developed—the Saitama Token—through manipulative trading and misleading statements, and thereby profit from selling Saitama Tokens. As motions to dismiss seemingly must, this Motion calls the Indictment "bare-bones," willfully ignoring or recharacterizing the Indictment's allegations of specific fraudulent conduct and false statements. At bottom, the Motion is a premature challenge to the sufficiency of the government's evidence. Whether the government can ultimately prove

---

[1] The government submitted a preliminary opposition to defendant Kohli's motion to dismiss on the grounds that Kohli should be disentitled to file a motion while he remains in the United Kingdom and continues to contest his extradition to the United States and avoid this Court's jurisdiction altogether. Dkt. 59. In light of Mohsini's request to join the Motion, the government opposes the Motion on the merits herein.

the allegations is a question of fact for the jury, *not* a basis for dismissal on the pleadings. For these reasons, and those set forth below, the Motion should be denied.[2]

## I. Applicable Law

The Federal Rules of Criminal Procedure provide that an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). This rule derives from the Fifth Amendment's requirement that a defendant be indicted by a grand jury before being held to answer for a criminal charge and the Sixth Amendment's guarantee that the defendant "be informed of the nature and cause of the accusation." *United States v. Stepanets*, 879 F.3d 367, 372 (1st Cir. 2018) (citing U.S. Const. Amends. V and VI).

"An indictment need not say much to satisfy [Rule 7(c)(1)'s] requirements—it need only outline 'the elements of the crime and the nature of the charge so that the defendant can prepare a defense and plead double jeopardy in any future prosecution for the same offense.'" *Id.* (quoting *United States v. Guerrier*, 669 F.3d 1, 3 (1st Circ. 2011)). Accordingly, an indictment will generally be sufficient if it "tracks the language of the underlying statute" provided "that the excerpted statutory language sets out all of the elements of the offense without material uncertainty." *United States v. Troy*, 618 F.3d 27, 34 (1st Cir. 2010).

"When a defendant seeks dismissal of an indictment, courts take the facts alleged in the indictment as true, mindful that 'the question is not whether the government has presented enough evidence to support the charge, but solely whether the allegations in the indictment are sufficient

---

[2] The government has determined that it will not proceed to trial on Title 18, United States Code, Section 1960(a) and (b)(1)(B)—the second object of the conspiracy charged in Count One of the Indictment. For the reasons stated herein, the Court should deny the Motion as to the remaining two objects of that conspiracy count, as well as to the Indictment's substantive counts.

2

to apprise the defendant of the charged offense.'" *United States v. Ngige*, 780 F.3d 497, 502 (1st Cir. 2015) (quoting *United States v. Savarese,* 686 F.3d 1, 7 (1st Cir. 2012)). "Indeed, 'courts routinely rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations.'" *Id.* (quoting *Guerrier,* 669 F.3d at 4). *See also id.* (the problem with the defendant's argument was that it "fail[ed] to attack the facial validity of the indictment and instead challenge[d] the government's substantive case").

Further, courts must exercise their authority to dismiss cautiously because dismissing an indictment "directly encroaches upon the fundamental role of the grand jury." *Whitehouse v. U.S. D. Ct. for the D. of R.I.*, 53 F.3d 1349, 1360 (1st Cir. 1995). *See also Guerrier*, 669 F.3d at 4 ("[I]n the ordinary course of events, a technically sufficient indictment handed down by a duly empaneled grand jury 'is enough to call for trial of the charge on the merits.'") (quoting *Costello v. United States*, 350 U.S. 359, 363 (1956)).

**II. The Indictment Adequately Alleges that the Saitama Token Was a "Security"**

The Motion argues that the Indictment fails to allege that the Saitama Token was a "security" for purposes of the market manipulation object of the conspiracy charged in Count One and the substantive market manipulation charges in Counts Two through Four. Motion at 11-14. However, whether the Saitama Token was a security requires factual determinations that are not properly the subject of a motion to dismiss.

The Indictment alleges that "[t]he Saitama Token was a security that at its peak had a market capitalization of $7.5 billion." Indictment ¶ 8. Counts One through Four allege that the defendants conspired to, and did, "knowingly and willfully … effect a series of transactions *in a security* not registered on a national exchange, *to wit, the Saitama Token*, creating actual and apparent active trading in such security, and raising and depressing the price of such security, for

3

the purpose of inducing the purchase and sale of such security by others." *Id*. ¶¶ 40(a), 42, 44, and 46 (emphasis added). The Indictment thus "tracks the language of the underlying statute[s]"[3] and "sets out all of the elements of the offense"—including the security at issue—"without material uncertainty." *See Troy*, 618 F.3d at 34. No more is required of the Indictment.

Whether the Saitama Token was a security is a mixed question of law and fact that the Court cannot properly resolve on a motion to dismiss the Indictment. *See, e.g., United States v. Han*, 280 F. Supp. 3d 144, 153–54 (D.D.C. 2017) ("Whether the promissory notes are securities is a mixed question of law and fact[.] … Deciding, at this juncture, whether the promissory notes are securities would require the Court to improperly make a determination of facts that should be developed at trial.") (internal citations omitted). *C.f. United States v. Marbelt*, 129 F.Supp.2d 49, 55–56 (D. Mass. 2000) (denying motion to dismiss because whether transportation of money from Boston to Puerto Rico was a financial transaction within meaning of relevant statute was a "mixed question[ ] of fact and law, properly decided at trial"). The Indictment alleges that the Saitama Token was a security; at this juncture the Court must "take [that fact] as true[.]" *See Ngige*, 780 F.3d at 502.

The Motion nonetheless complains that the Indictment lacks "facts," "details," or "explanation" supporting the allegation that the Saitama Token was a security. Motion at 12-14. Yet the Indictment in this case alleges the very kinds of facts about the Saitama Token that have

---

[3] Title 15, United States Code, Section 78i(a)(2) states that it is unlawful "to effect, alone or with 1 or more other persons, a series of transactions in … any security not [registered on a national securities exchange] … creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." Title 15, United States Code, Section 78ff(a) provides for criminal penalties for "willfully" violating provisions of the chapter containing Section 78i(a)(2).

4

led federal courts in other cases to conclude that cryptocurrencies in those cases qualified as securities.[4]

Section 2(a)(1) of the Securities Act defines a "security" broadly to include not only stocks and bonds but also an "investment contract." 15 U.S.C. § 77b(a)(1); *see also S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) ("security" is sufficiently broad "to encompass virtually any instrument that might be sold as an investment"). In *SEC v. W.J. Howey*, 328 U.S. 293 (1946), the Supreme Court established a three-part test defining an "investment contract" as (1) a "contract, transaction or scheme whereby a person invests his money," (2) "in a common enterprise," and (3) "is led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 301.

Courts applying the fact-specific *Howey* inquiry to cryptocurrencies have found that a cryptocurrency created by a company or development group that continues to promote and exert control over the cryptocurrency—for example, by conducting marketing campaigns and creating products that utilize the cryptocurrency—qualifies as an "investment contract." *See, e.g., Audet v. Fraser*, 605 F.Supp.3d 372, 392 (D. Conn. June 3, 2022) (cryptocurrency "Paycoin" was an investment contract because "a reasonable purchaser of Paycoin was motivated by the expectation of profits to be generated by [the company's] efforts to promote adoption and support a $20 price floor"); *U.S. Sec. & Exch. Comm'n v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 180 (S.D.N.Y. 2020) (cryptocurrency "Kin" was an investment contract because its creator also promoted "a series of new products, services, and systems" that used Kin such that "[g]rowth would rely heavily

---

[4] In pursuing a confusing point regarding the trading of Saitama Tokens on the decentralized exchange Uniswap (Motion at 13), the Motion mischaracterizes the holding in *Risley v. Uniswap*, 2025 WL 615185 (2d. Cir. Feb. 26, 2025). In that case, the Second Circuit affirmed the dismissal of a civil securities action against Uniswap because the exchange's role was "collateral" to token sales—not based on any finding that token sales on Uniswap were not securities transactions.

on Kik's entrepreneurial and managerial efforts"); *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *13 (S.D.N.Y. July 31, 2023) (digital tokens were investment contracts whereas tokens were deposited in pool for further investment and proceeds of token purchases were used to develop proprietary blockchain and increase value of tokens); *SEC v. Rivetz Corp.*, 2024 WL 4892590, at *7 (D. Mass. Sept. 30, 2024) ("RvT" tokens were securities because "Rivetz's technology increased demand for RvT tokens," and "value of purchasers' RvT tokens was directly dependent on Rivetz's entrepreneurial efforts to build and market the technology").

In one such case, *SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022), the court addressed part three of the *Howey* test: "whether the economic realities surrounding LBRY's offerings of [its cryptocurrency token] LBC led investors to have 'a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.'" *LBRY, Inc.*, 2022 WL 16744741 at *3 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975)). The court highlighted LBRY's marketing efforts and social media posts in which LBRY and its insiders spoke about the anticipated growth in the value of LBC based on the efforts of LBRY. *Id.* at *4-6 ("LBC would grow in value as the company continued to oversee the development of the LBRY Network," including the building of products compatible with LBC). The court also noted that LBRY's underlying business model connected the value of LBC to the increased use of the LBRY network. *Id.* at *6-7 ("By its own account, LBRY expended significant managerial efforts to develop its Network and increase the value of LBC."). Based on LBRY's marketing and underlying business model, the court rejected LBRY's contention that it did not offer LBC as a security.

Here, the Indictment contains allegations about Saitama's marketing and business model that are substantially like those examined in *LBRY*. It alleges: "Saitama purported to create

multiple products that could be used with the Saitama Token, including the SaitaMask cryptocurrency exchange, the SaitaMaker non-fungible token ('NFT') platform, the SaitaRealty real estate investment platform and the SaitaRealty cryptocurrency token, and SaitaMarket, among others." Indictment, ¶ 8. It explains that the defendants and co-conspirators "were leaders of the Saitama business and were featured as such on the company's website" (*id.* ¶ 9) and that the defendants and co-conspirators "solicit[ed] investors to buy Saitama Tokens through the Saitama website as well as through online marketing and messaging applications such as Telegram, Twitter, Instagram, and YouTube" (*id.* ¶ 16(b)). The Indictment alleges that Saitama's leaders "solicited donations from Saitama Token holders, claiming the funds would be used to pay for expenses related to operating the Saitama business." *Id.* ¶ 24. It also alleges that "Saitama's website published the Saitama 'whitepaper,' an informational document describing Saitama's mission and business plan[.]" *Id.* ¶ 28(a). Moreover, the Indictment alleges that Saitama advertised on its website that it had created a cryptocurrency exchange that "allowed users to exchange Saitama Tokens with other cryptocurrencies." *Id.* ¶¶ 31-32.

In sum, the Indictment alleges that Saitama published a business plan; solicited investors through online marketing and messaging applications; developed products that could be used with the Saitama Token (and thus would increase the value of Saitama Tokens); and claimed to raise funds from Saitama Token investors that would pay for expenses related to operating Saitama's business. These facts amply support the allegation that the Saitama Token was a security.

**III. The Indictment Sufficiently Alleges Market Manipulation**

The Motion separately insists that the Indictment fails to allege any actual trades in support of the market manipulation charges. Motion at 14-15. It argues this despite the Indictment's detailed, three-page description of messages in which the defendants and co-conspirators not only

7

discussed their plan to manipulate the Saitama Token's trading through their own purchases *but also confirmed that that they had done so*. *See*, *e.g.,* Indictment ¶ 20(i) ("At 2:24 p.m., TRAN messaged, 'Gooo' and Armand messaged, 'Small buys', to which TRAN responded, 'Did it,' KOHLI responded, 'Done', and Hernandez responded, 'same'."); ¶ 20(k) ("At 2:29 p.m., TRAN messaged, 'Round 2 start now!', to which Hernandez responded, 'bought a few times', and KOHLI responded, 'Done second' and 'Buying'.").

Again here, Counts One through Four track the underlying statutes in charging the defendants with "knowingly and willfully … *directly and indirectly effect[ing] a series of transactions* in a security not registered on a national exchange, to wit, the Saitama Token, creating actual and apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase and sale of such security by others." Indictment ¶¶ 40(a), 42, 44, and 46 (emphasis added). The substantive counts (Counts Two through Four) allege that the defendants specifically effected a series of manipulative transactions occurring on July 3, 2021, the date of the messages excerpted in the Indictment. The Indictment also alleges that the defendants both intended to and did create actual or apparent trading for the purpose of inducing others to buy the Saitama Token. *See*, *e.g.*, *id.* ¶ 20(b) (quoting Armand: "We will create an illusion of massive buys and new holders" and "[i]t'll incite ppl to buy more"); ¶ (quoting Armand: "Holders are increasing nicely and distribution is looking much better"). With respect to the conspiracy count (Count One), the Indictment additionally alleges that the defendants and co-conspirators paid third-party firms ZM Quant and Gotbit to buy and sell Saitama Tokens to artificially inflate the apparent trading volume of Saitama Tokens. *Id.* ¶¶ 10, 11, and 22.

The Motion's critique of the Indictment's market manipulation allegations boils down to a challenge to the sufficiency of the evidence of the defendants' manipulative trading. But as the

8

First Circuit has repeatedly made clear, that is not proper on a motion to dismiss. *See United States v. Alexander*, 958 F.3d 1, 4 (1st Cir. 2020) ("Traditionally, we 'rebuff efforts to use a motion to dismiss as a way to test the sufficiency of the evidence behind an indictment's allegations.'") (quoting *Guerrier*, 669 F.3d at 4). As set forth above, the issue on a motion to dismiss is not the government's proof, but "solely whether the allegations in the indictment are sufficient to apprise the defendant[s] of the charged offense[s]." *Savarese*, 686 F.3d at 7. The Indictment indisputably does that, and the Motion's "attempt to sink a facially valid indictment with a motion to dismiss that targets the strength of the government's *evidence* misfires." *Guerrier*, 669 F.3d at 3 (emphasis in original).

### IV. The Indictment Alleges both Venue and Use of Means and Instrumentalities of Interstate Commerce with Respect to Market Manipulation

The Motion separately seeks dismissal of the market manipulation count against Kohli (Count Two) for lack of (i) use of means and instrumentalities of interstate commerce or (ii) venue. Motion at 15-16. However, the Indictment is sound on both of these conditions.

With respect to the interstate commerce element, the Motion claims—without any support—that the Indictment must allege that Kohli's trades took place in the United States and that "communications [with co-conspirators located in the United States] alone are insufficient." This argument finds no support in the statute, which makes it unlawful "to effect … a series of transactions," whether "directly or indirectly" and whether "alone or with 1 or more other persons." 15 U.S.C. § 78i(a)(2). The Indictment alleges that Kohli did just that using Telegram (a means and instrumentality of interstate commerce) to synchronize his trades with the trades of other persons located in the United States. Indictment ¶¶ 19-20. The use of means and instrumentalities of interstate commerce and the nexus to the United States is clear on the face of the Indictment.

A motion to dismiss for lack of venue will be granted only if the indictment does not sufficiently allege conduct occurring in the trial district. *See United States v. Acherman*, 140 F. Supp. 3d 113, 117–18 (D. Mass. 2015) (Sorokin, J.) (citing *United States v. Condo*, No. 11–cr–30017–NMG, 2014 WL 1400817, at *1 (D. Mass. Apr. 7, 2014) (Gorton, J.)). At the motion to dismiss stage, "the allegations of the indictment and the unchallenged statement of proof of the prosecutor must be accepted as true." *Id.* at 118 (quoting *United States v. Ferris*, 807 F.2d 269, 271 (1st Cir. 1986)). "The government's ability to prove th[ose] allegation[s] is a question for trial." *Id.* (citations omitted). *See also United States v. Razo*, 2012 WL 5874667, at *6 (D. Me. Nov. 20, 2012) ("For now, the allegations in the superseding indictment assert that the criminal conduct occurred in part in the District of Maine, and are thus facially sufficient to support venue in the District of Maine. [The defendant] remains free to challenge those allegations at trial.").

The Indictment sufficiently alleges conduct in the District of Massachusetts. It alleges that co-conspirator Maxwell Hernandez was a resident of Massachusetts at all relevant times. Indictment ¶ 5. The Indictment further charges that the defendants and co-conspirators, including Hernandez, "coordinated a series of manipulative trades in Saitama Tokens, including through messages exchanged in a private Telegram chatroom[.]" *Id.* ¶ 19. It then details messages in which the defendants and co-conspirators, including Hernandez, confirmed their simultaneous purchases of Saitama Tokens. *See id.* ¶ 20(i) and (k). Count Two thus charges Kohli with market manipulation occurring "in the District of Massachusetts and elsewhere[.]" *Id.* ¶ 42. These allegations are facially sufficient to support venue in the District of Massachusetts.

The Motion claims that Kohli's trades alone are the "essential conduct" for purposes of determining venue. But that cannot possibly be the case where the offense encompasses "a series of transactions," including those effected "directly or indirectly" and those effected "with 1 or

more other persons," as the Indictment alleges here. *See* 15 U.S.C. § 78i(a)(2). Whereas Kohli coordinated over messages with Hernandez to effect a series of transactions that included purchases by Hernandez, those messages and trades were "essential conduct elements" of the market manipulation offense that occurred in Massachusetts.[5] Venue is accordingly proper in this District.

## V. The Indictment Adequately Alleges Wire Fraud

Finally, the Motion seeks dismissal of the wire fraud conspiracy object and counts based on a variety of purported factual and legal infirmities. Motion at 16-18. The Motion's arguments as to the wire fraud allegations are without merit.

The Motion first complains that the Indictment's wire fraud allegations lack specificity, chiefly because they attribute false statements and fraudulent conduct to multiple or all defendants. This complaint is beside the point. As the Motion itself acknowledges in reciting the elements of wire fraud (Motion at 16), the government must prove that a defendant knowingly and willfully *participated* in a scheme to defraud that used false or fraudulent pretenses. The Indictment alleges that the movant defendants participated in a scheme to defraud, which the Indictment outlines in detail. Proof of the defendants' knowing and willful participation in that scheme is a matter for trial.

Moreover, this complaint is inaccurate. The Indictment alleges false statements and fraudulent conduct against the movant defendants specifically by name. *See*, *e.g.*, Indictment

---

[5] The Motion also cites *United States v. Eisenberg*, 784 F. Supp. 3d 579 (S.D.N.Y. 2025), in which the court found that neither a third-party firm's trade facilitation nor a victim's receipt of false pricing signals provided a basis for venue on commodities manipulation charges. *Eisenberg* serves as a useful contrast to this case. Here, venue arises from the messages and trades in Massachusetts that were intrinsic to "effect[ing], …with 1 or more other persons, a series of transactions" in the Saitama Token.

11

¶¶ 24-25 (alleging that Kohli, Mohsini, and co-conspirators claimed that funds solicited from Saitama Token holders would be used to pay for Saitama business expenses but then used funds for other purposes); ¶¶ 26-27 (alleging that Kohli, Mohsini, and co-conspirators promoted Saitama on Twitter by referencing Saitama's manipulated rating on DEXTools); and ¶ 28 (alleging that Kohli, Mohsini, and co-conspirators promoted Saitama through a website containing false statements about purported regulatory review of Saitama's "whitepaper" and Saitama's coding). The Indictment leaves no uncertainty as to which conduct it alleges against which defendants. Its attribution of false statements and fraudulent conduct to multiple or all defendants is a reflection of the scheme, not a pleading deficiency.

Second, the Motion claims that the Indictment fails to allege the materiality of misrepresentations and omissions under *Kousisis v. United States*, 605 U.S. 114 (2025). But its arguments here reveal the Motion for what it is: a challenge to the sufficiency of the government's evidence. Whether "victims cared or reviewed DEXTools" (Motion at 17) or "anyone was concerned about whether a whitepaper had been 'reviewed by regulators'" (*id.* at 17-18) are questions reserved for the jury. The Indictment alleges that the misrepresentations were material; the Motion's attempts to discount those misrepresentations must wait for trial.

Third, the Motion mounts a cursory attack of the allegations regarding the defendants' intent. Motion at 18. The Indictment expressly alleges that the defendants "intend[ed] to devise a scheme and artifice to defraud[.]" Indictment ¶ 48. It also offers abundant allegations demonstrating defendants' intent to defraud, including the misrepresentations highlighted above and the extensive messages that the defendants exchanged with co-conspirators about "create[ing] an illusion of massive buys" to "incite ppl to buy more" (*id.* ¶ 20). *See Hughes v. United States*, 338 F.2d 651, 652 (1st Cir. 1964) (scienter element is sufficiently pleaded if "other allegations in

12

the indictment compel an inference of intent"). As with the Motion's other contentions, its challenge to the government's proof of intent provides no basis for dismissal on the pleadings.

Last, the Motion makes an assortment of arguments about the use of an interstate wire that confuse the law, ignore the text of the indictment, or skip to the sufficiency of the evidence. Motion at 18.

The Motion claims that "it is unknown whether any wires that Kohli sent or received were sent to or from the United States." Yet Count Seven of the Indictment specifically identifies the "[e]lectronic message from KOHLI, located outside Massachusetts, to Hernandez, located inside Massachusetts, and to others stating: 'US is easiest to get in trouble lol'." Indictment ¶ 48.

The Motion suggests that the use of the interstate wire must itself be a material misrepresentation. But the use of an interstate wire need only be "in furtherance of the scheme" to defraud, as the Motion's own recitation of the elements reflects (Motion at 16). The Indictment alleges that the defendants transmitted the specified interstate wires "for the purpose of executing the scheme to defraud." Indictment ¶ 48.

The Motion offers an alternative explanation of Kohli's message to the U.S.-based co-defendants and co-conspirators. His recharacterization has no bearing on the sufficiency of the Indictment's allegations.

The Motion also incorrectly suggests that the wire fraud count against Kohli amounts to an impermissible extraterritorial application of the wire fraud statute. But the Indictment alleges a *domestic* application of the wire fraud statute by alleging that Kohli transmitted a wire communication to the United States in furtherance of the scheme to defraud. *See*, *e.g.*, *United States v. Hussain*, 972 F.3d 1138 (9th Cir. 2020) (upholding wire fraud convictions as permissible domestic applications of the statute where UK-based defendant used emails, press releases, and

13

video and telephone conference calls to speak with individuals in the United States in furtherance of fraud); *United States v. Elbaz*, 52 F.4th 593 (4th Cir. 2022) (upholding wire fraud convictions as permissible domestic applications of the statute where Israel-based defendant caused emails and a phone call to be transmitted to victims in Maryland). While Kohli insists that his message to confederates in the United States was not "essential conduct," it is this very use of this wire communication for executing the scheme that is the focus of Count Seven. *See id.*, 52 F.4th at 603 ("Thus, the use of a wire is the essential conduct prohibited by § 1343.") (internal citation omitted).

Thus, not one of the Motion's arguments provides a basis for dismissing the wire fraud conspiracy object and counts.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the Motion and decline to dismiss any of the counts of the Indictment.

                                                Respectfully submitted,

                                                LEAH B. FOLEY
                                                UNITED STATES ATTORNEY

By:   */s/ David M. Holcomb*
        DAVID M. HOLCOMB
        Assistant United States Attorney

Date: December 3, 2025

## CERTIFICATE OF SERVICE

   I hereby certify that this document was filed through the ECF system on December 3, 2025 and will be sent electronically to the registered participants identified on the Notice of Electronic Filing (NEF).

             By:  */s/ David M. Holcomb*
                 David M. Holcomb
                 Assistant United States Attorney