**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **UNITED STATES** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | **No. 1:24-cr-10189-AK** |
| | § | |
| **v.** | § | |
| | § | |
| **MANPREET KOHLI, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

# JOINT REPLY MEMORANDUM OF LAW IN RESPONSE TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT KOHLI'S MOTION TO DISMISS THE INDICTMENT AS JOINED BY DEFENDANT MOHSINI (LEAVE TO FILE GRANTED 12/23/2025)

Eric S. Rosen
DYNAMIS LLP
175 Federal Street
Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

*Attorney for Plaintiff*

Mr. Kohli, joined by Mr. Mohsini (together, "Defendants'"), files this joint reply to the Government's December 3, 2025 opposition to Defendants' motion to dismiss the Indictment. *See* Dkt. 63 ("Opp."). For the reasons below, the Government's arguments are flawed.

## I. THE INDICTMENT FAILS TO PROPERLY ALLEGE THAT SAITAMA TOKEN IS A "SECURITY."

### *A. The Government's Opposition does not dispute that the Indictment impermissibly refers to Saitama Tokens as "money" while also declaring them to be "securities."*

As described in the defense's motion to dismiss, the Indictment is inherently contradictory because it refers to Saitama Tokens as "money" as part of the unlicensed money transmission charges *and* also refers to the Tokens as a "security" for the securities charges. Dkt. 55 at 8-9.

The Government's Opposition does not dispute that an object cannot be both a security *and* money. Instead, the Government chooses to ignore this argument—now including a footnote in its Opposition to explain that it will voluntarily not pursue the unlicensed money transmission charges at trial. Opp. at 2 fn. 2. But there is no way for these allegations to be reconciled. By definition, an object *cannot* be both a security and money. *See* 15 U.S.C. §78c(a)(10) (Title 15 definition of security mandates that a security "*shall not include currency or any note, draft, bill of* exchange."). This alone warrants dismissal of the securities fraud charges because, by issuing an Indictment alleging that Saitama Token is "money," the grand jury *necessarily* determined that the Saitama Token is *not* a security. The grand jury's evaluation of the evidence must control.

### *B. The Government's legal conclusion that Saitama Token is a "security" is insufficient under Rule 7(c)(1) of the Federal Rules of Criminal Procedure.*

The Government argues that simply referring to Saitama Tokens as a "security" in the Indictment is sufficient to adequately charge securities fraud. Opp. at 3-4 (relying on allegations providing that the "Saitama Token *was a security …*"). The Government is wrong.

Fed. R. Crim. Pro. 7(c)(1) requires an Indictment to have a "plain, concise and definite written statement of the *essential facts* constituting the offense charged …." *See also United States v. Savarese*, 686 F.3d 1, 6 (1st Cir. 2012) (*citing United States v. Mojica-Baez*, 229 F.3d 292, 309 (1st Cir. 2000)) ("[T]he indictment may use the statutory language to describe the offense, but it must also be accompanied by such a statement of facts and circumstances as to inform the accused of the specific offense with which he is charged."). As the case law cited by the Government makes clear, a conclusory allegation that an object is a "security" is *not* an "essential fact."

Rather, the determination that an object is a security presents a "mixed question of law *and* fact." Opp. at 4 (*citing United States v. Han*, 280 F. Supp. 3d 144, 153–54 (D.D.C. 2017)). As the Opposition explains, whether something is a security depends on whether the Indictment contains sufficient essential facts establishing: (1) a contract, transaction or scheme whereby a person invests his money," (2) "in a common enterprise" and (3) "is led to expect profits solely from the efforts of the promoter or a third party." *Id*. at 5 (*citing SEC v. W.J. Howey*, 328 U.S. 293 (1946)). Thus, the "essential facts" required by Rule 7 must establish each element of the three-part *Howey* test. *See United States v. Zaslavskiy*, 2018 WL 4346339 (E.D.N.Y. Sept. 11, 2018) (in determining whether the Indictment alleged that token was a security, court examined whether indictment alleged facts sufficient to satisfy the three-party Howey test); *see also Cochran v. United States*, 157 U.S. 286, 290 (1985) (an indictment must contain factual detail sufficient to "apprise[ ] the defendant of what he must be prepared to meet").

Unsurprisingly, the lone case cited by the Government, *Han*, 280 F. Supp. 3d at 153-54, does not suggest that calling something a "security" is sufficient to provide the "essential facts" necessary to properly plead a crime. The *Han* Indictment is attached hereto as Exhibit A, and as the Court can see, the Indictment repeatedly and pled, in detailed allegations, exactly why the

promissory notes at issue constituted investments. See Ex. A [*Han* Indictment]. The *Han* Indictment even included the fact that *Han* distributed the promissory notes pursuant to a "private placement memorandum" which, as alleged in the Indictment, is a "document that companies can provide to potential investors *when they are selling securities* that are exempted from the general requirement that securities must be registered under federal and state law." Accordingly, far from being helpful to the Government, *Han* holds that more is required to properly plead whether an object is an "investment contract."

Far more relevant to this matter is *Zaslavskiy*, 2018 WL 4346339, a 2018 case from the Eastern District of New York which answered the precise question of what facts must be pled to render an indictment charging a token as a security facially sufficient. The *Zaslavskiy* court examined each element of the *Howey* test and mapped the facts as alleged in the Indictment to that three-pronged test. The *Zaslavskiy* court found that the tokens at issue were alleged to be securities because purchasers of the coins were specifically told they were buying "investment-backed virtual tokens." The Indictment also pled a "common enterprise" under *Howey* because the Indictment alleged "horizontal commonality" sufficient to "establish a common enterprise." And last, the Indictment alleged that investors expected profits on their investment from the managerial efforts of the defendant because of the detailed marketing materials distributed to investors as part of defendant's efforts to sell the coin. *See also United States v. Bowdoin*, 770 F. Supp. 2d 142 (D.D.C. 2011) (same, court walked through the three-prong *Howey* test to determine whether "auto-surf" business model constituted the "sale of investment contract securities.").

Thus, there is no case that the Government has found that shows that simply calling something a security is sufficient under the Rule 7 pleading standards.

*C. The Indictment fails to plead the elements of the three-prong Howey test.*

In the alternative, the Government argues, the Indictment's allegations satisfy the three-prong *Howey* test for determining whether a token is an "investment contract." This argument is frivolous.

*First*, the Indictment does not use the term "investment contract" to describe the Saitama Tokens. The Government cannot simply add in non-existent allegations to bolster their case; they must present these facts to the grand jury. The Government's attempt to do so now amounts to a constructive amendment of the Indictment that cannot help cure a facially invalid Indictment. *See United States v. Parigian*, 824 F.3d 5, 8 (1st Cir. 2016) (legal review of Indictment limited to the "four corners of the Indictment"). For this reason alone, the Government's argument can be rejected.

In any event, even a cursory review of the Indictment's allegations confirms that there are insufficient allegations to allow a reasonable jury to conclude that Saitama Tokens are "investment contracts" under the Howey test. To that end, the Opposition repeatedly and improperly conflates together the Saitama business with the Saitama Token. The Opposition relies on the Indictment's allegation that "Saitama purported to create multiple products that could be used *with the Saitama Token*, including the SaitaMask cryptocurrency exchange, the SaitaMaker non-fungible token ('NFT') platform, the SaitaRealty real estate investment platform and the SaitaRealty cryptocurrency token," to support the proposition that Saitama Token was some type of investment contract. Opp. at 6-7. But this paragraph simply refers to the overall business (*not the Token*) having potentially different products. And having products that can use a Token does not establish: 1) the pooling of assets by investors, 2) any expectation that token holders would receive a pro-rata distribution of profits sufficient to establish horizontal commonality, or 3) that profits from the Tokens themselves would be derived solely from the managerial efforts of the defendants. To

the contrary, the fact that the Tokens could only be "used" with other ventures makes clear that Token holders would not be entitled to any of the profits from those other ventures and that the Tokens were just the currency with which people could the various products. This is no different from when a person uses fiat currency to buy an airline ticket. The person is purchasing a service, not investing in the airline. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004) ("security" encompasses "virtually any instrument that might be *sold as an investment*").

Likewise, the fact that defendants "were leaders *of the Saitama business* and were featured as such on the company's website" means nothing. Opp. at 7. At issue is whether the Saitama Tokens themselves allegedly being sold to outsiders were securities, not whether the Saitama *business* was a security. *See SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 220 (D.N.H. Nov. 7th 2022) ("reasonable purchaser of LBC would understand th*at the tokens being offered represented investment opportunities*").

And the allegation that defendants "solicited donations from Saitama Token holders, claiming the funds would be used to pay for expenses related to operating the Saitama business" only confirms that the Tokens were not securities. Opp. at 7. Token holders were asked to make "donations" and donations, of course, are not investments through which investors expect to receive a return on their investment. *See New Jersey v. Bessent*, 149 F.4th 127, 146 (2d Cir. 2025) (payment of money or property to an entity recognized by I.R.C. § 170(c) "generally cannot constitute a charitable contribution if the contributor expects a substantial benefit in return" … "If, in exchange for a donation, a taxpayer receives a return benefit "commensurate with the payment or if obtaining the benefit is the reason for making the payment, ... the payment is a quid pro quo rather than a gift."). And even, as alleged, these "donations" were used to operate the "Saitama business" and were not distributed to the Token holders as pro-rata profits' share. In sum, contrary

to the Government's assertions, that Saitama was soliciting donations—a payment with nothing expected in return—confirms only that Token holders had no expectations of profits.

Last, the mere allegation that Saitama advertised that a crypto-exchange had been created to allow users to "exchange Saitama Tokens with other cryptocurrencies" means little. Opp. at 7. Of course, this allegation also supports the unlicensed money transmission charge. And there is no suggestion that token holders would receive a pro-rata share of any profits earned by the exchange. It suggests only what it means—Saitama Token holders traded in and out of the Token.

Once again, the Government cites not a single case that is even remotely favorable for its position here. In *SEC v. Rivetz Corp*. 2024 WL 4892590 (D. Mass. Sept. 30, 2024) the Company raised funds through sales of its coins to develop "security technology for mobile devices." The Company's white Paper asked investors to "invest" in the company (by purchasing tokens) in order to "reap a financial reward as Rivetz's technology increased demand" for the tokens. None of those allegations are present here. To the contrary, Saitama sought "donations" to grow their business; promising these good Samaritans nothing in return.

Likewise, *in SEC v. LBRY*, 639 F. Supp. 3d 211 (D.N.H. 2022), the defendants told investors that purchasers of the token would profit as "use of the network increased" because profits would be distributed pro rata to token holders. There is nothing like that in this Indictment. Rather, the Indictment makes clear that the Token was purely for speculation and collection—a meme coin—as people made small purchases of between "1-4 *trillion*" tokens at a time. Dkt. 10 at ¶10. It strains credulity to suggest that where people are trading trillions of tokens at once that people would have any expectation that the Token was anything more than a speculative meme coin that people bought on the hope that something would cause it to increase in value.

## II. <u>**The Government concedes that they have not been able to identify transactions sufficient to allege market manipulation.**</u>

The Government does not dispute that the Indictment fails to specify the actual trades that constitute the charge of market manipulation, which requires the Government to allege "a series of transactions in a security …". Opp. at 8. Instead, the Government claims that text messages between conspirators discussing alleged purchases of tokens is sufficient. The Government also argues that simply tracking the language of the statute is enough to charge a crime. The Government is wrong on both counts.

*First*, as described, Rule 7 requires the "essential facts" to be alleged. It is insufficient to simply track a statute without providing the defense with the facts constituting the crime.

*Second*, the Government cites no case that can suggest that discussions about trading over text message suffices to state the offense of market manipulation, where the Government does not identify the actual trades themselves. Surely, the Government has blockchain evidence of what trades occurred when and were made by whom. Simply relying on uncorroborated text messages cannot suffice to plead a "series of transactions in a security."

The reason why market manipulation requires actual trades is that the Government must also allege that these specific trades raised or depressed the price of the securities. Dkt. 63 at 8. Put differently, the Government must not show just a discussion about trading, it must show trading that actually affects the price. Without actual trades it cannot do this. And the Government's Opposition fails to even address the fact that this critical element of market manipulation—trades affecting price, which was an issue raised by the defense in its opening brief, is missing from the Indictment. Dkt. 55 at 14.

Accordingly, because the Indictment fails to allege actual trades (as opposed to discussions regarding trades) and because the Indictment, as the Government concedes, fails to allege that

these specific trades raised or depressed the price of securities, the Indictment fails to state the offense of market manipulation.

### III. <u>The Government's contention that the Indictment alleges interstate commerce or venue is mistaken.</u>

The Government concedes that Mr. Kohli is not alleged to have used a national securities exchange or to have placed any trade in the United States. But, the Government contends, because he communicated with others regarding trading, this element is satisfied. Not so.

*First*, the Government cites not a single case holding that communications alone—and not the actual trades—suffice to establish the interstate commerce element of market manipulation. Nor would the Government's argument make sense—the statute refers to "transactions relating to purchase or sale of security." Communications with others are not an element of the crime. What *is* an element of the crime are the trades themselves, none of which were placed by Mr. Kohli within the United States.

*Second*, even if the Government's argument is accepted, it can apply only to Count One of the Indictment, which is the conspiracy count. Count Two is a standalone "market manipulation" count that charges only Mr. Kohli. Mr. Kohli is not charged with working together with others, and he is not charged with aiding and abetting. He is charged with effecting a series of transactions in a security that resulted in raising or depressing the security's price to induce the purchase and sale of the security by others. As the Government concedes, not one trade by Mr. Kohli took place in the United States. Therefore, the interstate commerce element of this crime is not alleged.

*Third*, and for this same reason, there is no venue in the District of Massachusetts for the substantive securities fraud count. As the Government does not dispute, Mr. Kohli never placed any trade—the "essential conduct" of the crime—in the District of Massachusetts. Instead, the Government relies entirely on the allegations undertaken by Mr. Hernandez to support venue for

Mr. Kohlil. But to the extent that this suffices to work for the conspiracy count, it does not work for Count Two. As Count Two makes clear, Mr. Kohli acted alone. Dkt. 10 ¶¶41-42. There are no aiding and abetting charges. Count Two does not say he worked with Mr. Hernandez. Count Two does not even say, as the Government now claims, that Mr. Kohli effected transactions "with 1 or more other persons" as the Government now claims.[1] Opp. at 10-11. Rather, Count Two stresses that it was "Manpreet Kohli" who "directly and indirectly effect[ed] a series of transactions in a security …". To the extent that the Government now wants to add more people into Count II, it must amend the Indictment.

## IV. **The Indictment fails to plead wire fraud**

Like with the Government's other responses, the Government, in response to the defense's argument that the wire fraud allegations "lack specificity," claims that any failure to do so is "beside the point," and that the Indictment does, in fact, provide specific "false statements and fraudulent conduct against the movant defendants specifically by name." Opp. at 11. The Government is wrong.

Contrary to the Government's belief, Indictments must do more than recite a crime's elements. Rather, an Indictment must allege sufficient facts to allow the defendant to prepare a defense, ensure that the defendant is prosecuted on the facts presented to the grand jury, enable the defendant to plead jeopardy against a later prosecution, and inform the court of the facts alleged so that it can determine the sufficiency of the charge. *See Russell v. United States*, 369 U.S. 749, 763, 768 n.15 (1962). The failure of an Indictment to detail each element of the charged offense

[1] The Opposition references the term "alone or with 1 or more other persons," which is in the actual statute. *See* 15 U.S.C. § 78i(a)(2). The Opposition uses this to imply that Mr. Kohli could be charged based on the trades of other people. Yet none of this language is in the Indictment (*see* Dkt. 10 ¶¶41-42), confirming that the actual charge is based on Kohli's trading alone.

and provide a sufficient factual basis for the charges constitutes a fatal defect warranting dismissal of the Indictment.

In *United States v. Keuylian*, 23 F. Supp. 3d 1126 (S.D. Cal. 2014), the court dismissed a wire fraud indictment that simply tracked the "statutory language without any fair indication of the scheme to defraud, or the false pretenses, misrepresentations, or promises forming a part of it." The *Keuylian* Indictment was dismissed because it also failed to allege that any victims were deceived by any alleged false statements—"without some allegation that VCI was deceived or tricked into being deprived of the $12.6 million it was owed, the present Indictment fails to allege an essential element of wire fraud."

Likewise, *in U.S. v. Urso*, 369 F. Supp. 2d 254, 266 (E.D.N.Y. 2005), the Court dismissed certain loansharking charges because they were "vaguely pled" in the Indictment. Specifically, the Court held that an Indictment is only "sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet …." The Court added that "while an indictment may set forth individual identifying characteristics of the charged crime in "approximate terms," each allegation, read in the context of the whole indictment, must still be pled with sufficient factual particularity such that the defendant is able to prepare to meet the government's charges, and such that all concerned parties, including the court, can be confident that the government's case at trial will reflect the evidence presented to the grand jury."

And, in *U.S. v. Chang*, 722 F. Supp. 3d 1340 (N.D. Ga. 2024), the Court dismissed almost every count in the wire fraud indictment, noting that wire fraud requires either material misrepresentations or the "omission or concealment of a material fact calculated to deceive another out of money or property." *Id.* at 1347. The Indictment failed to plead materiality because it did not allege that any false statement or omission had a "natural tendency to influence, or is capable

of influencing the decision of the decisionmaker to whom it was addressed." The court also held that the indictment, although it tracked the statutory language, provided only a "few facts describing the particulars of the alleged scheme to monetarily defraud Georgia Tech." *See also United States v. Schmitz*, 634 F.3d 1247, 1260–64 (11th Cir. 2011) (vacating defendant's conviction and holding that the district court erred in not dismissing federal-funds fraud counts as insufficient where the indictment tracked the statutory language but did not allege adequate facts to state an offense under the statute); *United States v. Bobo*, 344 F.3d 1076, 1083–86 (11th Cir. 2003) (vacating defendant's conviction and holding that the district court erred in not dismissing healthcare fraud counts as insufficient where the indictment tracked, in part, the statutory language but did not allege sufficient facts to state an offense under the statute); *United States v. Tripodis*, No. 1:18-CR-240-1-TWT, 2020 WL 914681, at *3 (N.D. Ga. Feb. 26, 2020) (dismissing wire fraud and mail fraud counts where the indictment tracked the statutory language but did not include sufficient facts to adequately allege each element of the offense).

As these cases make clear, this Indictment is insufficient despite the Government's best attempts to justify the lack of detail. The Government claims, for example that the Indictment alleges that "Kohli, Mohsini, and co-conspirators claimed that funds solicited from Saitama Token holders would be used to pay for Saitama business expenses but then used funds for other purposes." Opp. at 11-12. But there are no details in these two paragraphs in the Indictment. Dkt. 10 ¶¶24-25. Those paragraphs simply allege that all the defendants, "beginning in or about June 2021" (with no end date), "solicited donations from Saitama Token holders, claiming that the funds would be used to pay for expenses related to operating the Saitama business." *Id*. ¶25. There are no details as to who said what, when the statements were made, how much was donated, and why,

given that the business was allegedly to support Saitama, the purchase of Saitama Tokens was materially false. It is impossible for Mr. Kohli to know what he has been charged with.

Likewise, the Opposition points to the allegation that all five defendants "beginning in or around July 2021" manipulated DEXTools to artificially rank "Saitama Token" higher. Dkt. 10 ¶26-27. Once again, there are no details as to when this manipulation occurred (other than being after July 2021), who did what, and whether anyone was materially misled by this DEXTools ranking.

Similarly, ¶28 of the Indictment, another paragraph cited in the Opposition, characterizes statements made by, once again, all five defendants after September 2021. There are no details as to who said what or when. The statements were also allegedly made on Saitama's website, which contained a "whitepaper" that contained a single alleged misrepresentation. There are no allegations as to why that one single misrepresentation in a whitepaper was material to anyone. ¶28(a). And there are no allegations concerning who wrote or when that person wrote on the Saitama website that the Token was coded to prevent "whales" from "dumping the token by selling out." All of these details are missing from the alleged false statements in the Indictment.

Finally, the Government's Opposition fails to explain how Kohli's alleged electronic message "US is easiest to get in trouble lol" is at all related to a scheme to deprive token purchasers of money. Opp. at 13. The statement has nothing to do with retail consumers, which is why the Government includes it in the section entitled "Efforts to Avoid US Regulators and Law Enforcement," and not the "False and Misleading Statements" section. The wire fraud alleged in the Indictment is directed at consumer purchasers; this private communication by Kohli to Hernandez and others has nothing to do with that. The only argument the Government can muster as to why this wire is "in furtherance of the scheme" is by quoting the generic language of the

Indictment which states that the wire was "for the purpose of executing the scheme to defraud." But, as the cases cited above explain, simply tracking the statutory language is insufficient.

Thus, even if the conspiracy count survives—it should not—Count 7 must be dismissed.

## V. CONCLUSION

For all these reasons, Kohli respectfully requests that the Indictment against Mr. Kohli, and Mr. Mohsini, be dismissed.

Dated: December 12, 2025

Respectfully submitted,

*/s/ Eric S. Rosen*

Eric S. Rosen
DYNAMIS LLP
175 Federal Street, Suite 1200
Boston, MA 02110
(646) 541-8484
erosen@dynamisllp.com

# Ex. A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term**
**Grand Jury Sworn in on May 5, 2015**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Crim. No.** |
| | : | |
| | : | **Grand Jury Original** |
| **v.** | : | |
| | : | **Charges:** |
| | : | |
| | : | **18 U.S.C. § 1343 (Wire Fraud)** |
| **MICHAEL SANG HAN,** | : | |
| | : | **15 U.S.C. §§ 78j(b) and 78ff, and** |
| **Defendant.** | : | **17 C.F.R. § 240.10b-5 (Securities Fraud)** |
| | : | |
| | : | **18 U.S.C. § 1957 (Monetary Transactions** |
| | : | **in Property Derived from Specified** |
| | : | **Unlawful Activity)** |
| | : | |
| | : | **D.C. Code §§ 22-3221(a), 22-3222(a)** |
| | : | **(First Degree Fraud)** |
| | : | |
| | : | **Forfeiture: 18 U.S.C. §§ 981(a)(1)(C),** |
| | : | **982(a)(1), & 28 U.S.C. § 2461(c)** |

## INDICTMENT

The Grand Jury charges:

## FRAUDULENT SCHEME

At various times relevant to this Indictment, in the District of Columbia ("the District") and elsewhere:

### RELEVANT PERSONS AND ENTITIES

1. Defendant MICHAEL SANG HAN, at various times during the relevant period, resided in the District; McLean, Virginia; and Palm Beach, Florida. From in or about February

2004, through in or about, at least, November 2011, he was Chairman, Chief Executive Officer, and President of Envion Inc. ("Envion").

2. Envion purported to be a privately-held, science and technology company. At various times during the relevant period, Envion operated out of the District; Vienna, Virginia; and West Palm Beach, Florida. Although Envion operated out of the District prior to April 1, 2009, it was not incorporated in the District until April 1, 2009. HAN claimed that Envion owned, and possessed a U.S. patent for, the "EZ Oil Generator" ("Oil Generator"), a machine that could purportedly convert waste plastics into oil.

3. Company 1 is a Chinese company that owned, and possessed Chinese patents for, the Oil Generator.

4. Person A is a Chinese national and the president of Company 1.

5. Investor 1 resides in Virginia, but has an office in the District. His email account is managed by an administrative assistant based in the District who opens and sends all emails in the account from the office within the District. The office's server is maintained in Virginia. Accordingly, any emails sent by, or received in, Investor 1's account travel between the District and Virginia.

6. Investor 2 resides in Maryland.

7. A private placement memorandum is a document that companies can provide to potential investors when they are selling securities that are exempted from the general requirement that securities must be registered under federal and state law. If a company issues a private placement memorandum, the document should explain the terms of the investment and the risk associated with the investment. Information in a private placement memorandum cannot be false or misleading.

The Scheme to Defraud

8. From at least in or about March 2004 through at least in or about November 2011, MICHAEL SANG HAN perpetrated a scheme to defraud by inducing Investor 1 and Investor 2, through a series of false representations, to invest, and maintain their investments, in Envion. Specifically, HAN falsely claimed, at various times during the course of the scheme, that Envion possessed a U.S. patent for the technology and that Envion possessed the means to manufacture and to sell the Oil Generator. Moreover, HAN falsely claimed that any funds invested in Envion would be used to support Envion's business, and he failed to disclose that he intended to use substantial portions of the funds invested for his personal benefit and that, for investments that occurred later in the scheme, he had used substantial portions of earlier investments for his personal benefit.

9. In truth and in fact, as MICHAEL SANG HAN well knew, HAN did not possess a U.S. patent for the Oil Generator, and even though he had agreed to purchase the foreign patents that Company 1 possessed, he failed to pay the agreed upon amounts for the purchase. Moreover, Envion lacked the capacity to manufacture and to deliver the Oil Generator.

10. The investments by Investor 1 and Investor 2 constituted nearly all of the funds Envion received during the relevant period, and MICHAEL SANG HAN derived the overwhelming majority of the funds in his personal accounts from Envion. Throughout the relevant period, HAN looted Envion using investor funds to pay for his lavish lifestyle. Without Investor 1's and Investor 2's investments, HAN would not have been able to maintain the lifestyle he maintained for the duration of the relevant period.

11. As a direct result of this scheme, from at least in or about March 2004 through at least in or about April 24, 2012, MICHAEL SANG HAN induced Investor 1 and Investor 2 to

invest nearly $40 million in Envion. HAN failed to return any portion of the principal these two investors invested. HAN diverted millions of dollars from these investments, using in excess of $6 million for his personal real estate expenses alone.

*Envion Failed to Pay for Patents or Technology Rights for the Oil Generator*

12. Around or after February 2004, MICHAEL SANG HAN began talking to Person A about acquiring Company 1's assets and certain patents that Company 1 had for the Oil Generator. Significantly, while Company 1 had several non-U.S. patents for the Oil Generator, the Oil Generator was not patented in the United States.

13. In and around December 2004, MICHAEL SANG HAN and representatives of Company 1 began finalizing the terms of an agreement between Envion and Company 1 for the Oil Generator. The terms, as contemplated by the parties at that time, included Envion paying an asset purchase price of $1 million and a patent transfer fee of $1.5 million. In addition, Company 1 would obtain 35 percent of Envion's shares.

14. In and around February 2005, MICHAEL SANG HAN and representatives of Company 1 began discussing an arrangement under which Envion would pay a down payment for these non-U.S. patents; immediately take possession of these patents; and pay the balance due through a series of installment payments.

15. In and around February 2005, Person A traveled to the United States to execute a memorandum of understanding between Envion and Company 1. In addition, Person A provided MICHAEL SANG HAN with the non-U.S. patents for the Oil Generator in exchange for a down payment and a commitment from HAN that he would pay the balance owed through a series of 74 installment payments of $20,000 that HAN was supposed to begin paying in March 2005.

16. On or about March 5, 2005, MICHAEL SANG HAN failed to pay the first of these $20,000 installment payments. And HAN failed, between March 2005 and May 2011, to pay the 74 installment payments of $20,000 that were, under the agreement, due during this period.

17. From in and around February 2005 through in or around August 2008, despite entering into this memorandum of understanding with Company 1, Envion not only lacked the technology to manufacture the Oil Generator, it also did not even possess a single Oil Generator.

*2003 – August 2008: Investor 1 and Investor 2 Invested in Envion Based on Han's False Claims that Envion Owned the Oil Generator and Possessed Patents for It*

**Investor 1**

18. In and around 2003, MICHAEL SANG HAN met Investor 1. HAN, even before he executed the memorandum of understanding, falsely represented to Investor 1 that Envion owned the Oil Generator and possessed patents for it.

19. In and around January and February 2004, MICHAEL SANG HAN continued to falsely represent to Investor 1 that Envion possessed the technology to manufacture the Oil Generator and possessed patents for the technology.

20. On or about March 4, 2004, Investor 1, relying on MICHAEL SANG HAN's false statements, invested $500,000 in Envion. This investment was the first of many investments by Investor 1.

21. In and around October 2005, MICHAEL SANG HAN provided Investor 1 with a private placement memorandum for Envion. The private placement memorandum falsely represented, among other things, that: i) Envion held a December 2003 U.S. patent, bearing number 60481826, related to the Oil Generator; ii) Envion owned the Oil Generator technology; iii) Envion had a manufacturing plant and a research-and-development facility based in China;

and iv) the proceeds raised in connection with the private placement memorandum would be used to "[e]xecute business model for global distribution of technology." The document failed to disclose that Envion lacked the capacity to produce the Oil Generator; at that time, Envion did not even have a single Oil Generator in its possession; and Company 1 continued to operate as an independent company and was the only company that had the capacity to manufacture the Oil Generator.

22. Between on or about November 11, 2004, and on or about August 1, 2008, MICHAEL SANG HAN induced Investor 1 to invest the following additional amounts in Envion:

| Date of Investment | Amount of Investment |
|---|---|
| 11/11/04 | $400,000 |
| 3/29/05 | $300,000 |
| 6/3/05 | $175,000 |
| 6/7/05 | $95,000 |
| 2/21/06 | $350,000 |
| 6/29/06 | $250,000 |
| 8/4/06 | $250,000 |
| 4/1/07 | $168,000 |
| 7/23/07 | $150,000 |
| 10/15/07 | $300,000 |
| 8/1/08 | $900,000 |
| 12/20/08 | $200,000 |

**Investor 2**

23. In or around December 2006, Investor 1 introduced Investor 2 to MICHAEL SANG HAN. HAN represented during meetings with Investor 2, that Envion owned the rights to the Oil Generator.

24. Between on or about June 20, 2007, and on or about August 1, 2008, MICHAEL SANG HAN, through his false representations that Envion owned the rights to the Oil Generator, induced Investor 2 to invest the following amounts in Envion:

| Date of Investment | Amount of Investment |
|---|---|
| 6/20/07 | $200,000 |
| 9/14/07 | $200,000 |
| 12/5/07 | $210,000 |
| 2/27/08 | $1,000,000 |
| 8/1/08 | $2,000,000 |

**Other Investors Solicited**

25. Between in and around 2003 and in and around August 2008, MICHAEL SANG HAN solicited others to invest in Envion and caused different versions of Envion's private placement memorandum to be generated, but he was unable to secure any investors other than Investor 1 and Investor 2.

**Use of Investments for Personal Enrichment**

26. Between on or about March 4, 2004, and on or about August 1, 2008, MICHAEL SANG HAN transferred and caused to be transferred, at least $3.5 million of the approximately $7.6 million Investor 1 and Investor 2 invested in Envion, during that period, to personal accounts HAN maintained. A substantial portion, if not all, of the $3.5 million in funds transferred were used for personal expenses. Personal expenditures during this period included:

a) Approximately $1.4 million to pay down balances on personal credit cards;

b) Approximately $282,000 in debit card purchases from his personal account, including approximately $59,000 in charges at night clubs and approximately $61,000 in charges for home furnishing and home improvements; and

c) Approximately $391,000 in cash withdrawals.

27. These personal expenditures frequently involved MICHAEL SANG HAN transferring all, or substantially all, of Investor 1's and Investor 2's investments from Envion to one of HAN's personal accounts shortly after the investments were made. By way of example, on or about December 5, 2007, Investor 2 invested $210,000 in Envion. HAN caused the $210,000 investment to be deposited in an Envion account that had a balance of $7,297.30 immediately before the deposit. In less than one week, HAN made and caused to be made three withdrawals from this Envion account that totaled $210,000: a $50,000 withdrawal on December 5, 2007; a $40,000 withdrawal on December 7, 2007; and a $120,000 withdrawal on December 11, 2007. The balance in the Envion account returned to $7,297.30—the same balance in the account prior to Investor 2's investment. The exact same day that each of these withdrawals occurred, there was a corresponding deposit, *in the exact same amount*, in one of HAN's personal accounts. HAN used the funds in this personal account to engage in a series of transactions in December 2007, including:

a) making approximately $17,000 in cash withdrawals;

b) using approximately $30,000 to pay down balances on personal credit cards; and

c) purchasing approximately $6,500 in goods at a luxury watch and fine jewelry store.

While there were funds in this personal account before HAN caused the $210,000 to be deposited in it, there were, without Investor 2's investment, insufficient funds in the account for HAN to engage in the above-referenced transactions in December 2007.

*August 2008 – April 2010: Envion Unsuccessfully Attempted to Gain Control over Company 1's Rights to the Oil Generator*

28. On or about August 27, 2008—more than four years after Investor 1's first investment—Envion entered into a contract with Company 1 to purchase the first, and only, Oil

Generator that Envion ever possessed. The purchase price was $2 million. MICHAEL SANG HAN executed the deal on behalf of Envion. The agreement referred to Envion as Company 1's customer and conferred no rights to the Oil Generator technology, patents, or trade secrets.

29. In and around December 2008, MICHAEL SANG HAN and others began negotiating an asset purchase agreement between Envion and Company 1 that would have conveyed all rights, title, and interest in Company 1's assets from Company 1 to Envion. Envion was to pay $45 million under this asset purchase agreement and was supposed to transfer five percent of Envion's stock (at a $250 million valuation) to Company 1.

30. From in and around December 2008 through in and around August 2009, MICHAEL SANG HAN and others worked on finalizing an asset purchase agreement that would have given Envion the types of rights that HAN had been falsely claiming since at least March 2004 that Envion possessed.

31. In and around August 2009, MICHAEL SANG HAN executed two versions of the asset purchase agreement. One version falsely purported to have been executed in February 2004 and the other version falsely purported to have been executed in December 2008.

32. Between in and around August 2009 and in and around November 2011, MICHAEL SANG HAN and Envion failed to pay Company 1 any amount remotely near the $45 million needed for Envion to obtain the rights that HAN had been falsely claiming since at least March 2004 that Envion possessed.

33. On or about May 19, 2010—approximately six years after Investor 1's first investment—Envion had still not completed the sale of even a single Oil Generator unit. In an email discussing problems with the dealings between Envion and Company 1, MICHAEL

SANG HAN wrote, "This is serious now. Investors are extremely mad @ me for lying. I don't know what to do."

34. MICHAEL SANG HAN failed to share any of these concerns with Investor 1 and Investor 2. Instead, HAN continued to solicit Investor 1 and Investor 2 under the false pretense that Envion owned the rights to the Oil Generator. Moreover, HAN failed to disclose to either Investor 1 or Investor 2 that he had used a substantial portion of their earlier investments for his personal enrichment. Between on or about December 21, 2008, and on or about July 6, 2010, HAN induced the following Investments:

**Investor 1**

| Date of Investment | Amount of Investment |
|---|---|
| 5/7/09 | $1,500,000 |
| 7/20/09 | $2,000,000 |
| 10/21/09 | $3,000,000 |
| 4/21/10 | $1,800,000 |

**Investor 2**

| Date of Investment | Amount of Investment |
|---|---|
| 12/21/08 | $400,000 |
| 2/15/09 | $500,000 |
| 4/13/09 | $250,000 |
| 6/3/09 | $500,000 |
| 7/6/10 | $2,300,000 |

**Use of Investments for Personal Enrichment**

35. Between on or about December 21, 2008, and on or about July 6, 2010, MICHAEL SANG HAN transferred and caused to be transferred, at least $3.3 million of the approximately $12.2 million Investor 1 and Investor 2 invested in Envion, during that period, to

personal accounts HAN maintained. A substantial portion, if not all, of the funds transferred were used for personal expenses, including:

a) Approximately $500,000 in debit card purchases, including over $88,000 at night clubs and $51,000 at a musical equipment shop for a high-end piano;

b) Cash withdrawals of approximately $332,000; and

c) Approximately $223,000 to pay down balances on his personal credit cards.

*October 2010 – August 2011: MICHAEL SANG HAN Induced Investor 1 to Invest an Additional $20 Million and Negotiated a Global Promissory Note with Investor 1*

36. On or before October 25, 2010, MICHAEL SANG HAN asked Investor 1 to invest an additional $40 million with Envion. Investor 1 responded that $40 million was more than Investor 1 was willing to invest, but that Investor 1 would be willing to invest an additional $20 million with Envion.

37. On or about October 25, 2010, Investor 1, relying on MICHAEL SANG HAN's false and misleading statements about Envion, caused a facsimile to be sent from the District to Maryland that instructed a financial institution that maintained an account for Investor 1 to wire $20 million from the account to an account that HAN identified. The account HAN identified was one of his personal accounts, not a business account.

38. On and shortly after October 25, 2010, MICHAEL SANG HAN immediately began using substantial portions of the $20 million for his personal use, not for expenses related to Envion as HAN represented the funds would be used when he solicited Investor 1. At the time of the transfer, the personal account that received the $20 million had a balance of approximately $23,370.57. HAN immediately transferred approximately $18.9 million from this personal account to another personal account. At the time of this transfer, this second personal

account had a balance of *zero* dollars. HAN used the overwhelming majority of this $18.9 million to fund personal expenditures, including:

a) Purchasing, on or about March 21, 2011, an approximately $3,096,678 home in Palm Beach, Florida;

b) Paying a contractor, from on or about February 25, 2011, through on or about November 17, 2011, approximately $1,919,493 for improvements to the Palm Beach Florida, home;

c) Paying a second contractor, from on or about February 17, 2011, through on or about December 13, 2011, approximately $895,173 for improvements to the same Palm Beach, Florida home;

d) Purchasing, on or about March 23, 2011, a 2011 BMW 328i convertible for approximately $56,000;

e) Purchasing, on or about June 30, 2011, a 2008 Ferrari 430 Scuderi for approximately $226,000 (purchased in the name of another company HAN operated);

f) Purchasing, on or about August 2, 2011, a 2011 Range Rover for approximately $57,682;

g) Using over $800,000 to pay down balances on his personal credit card. The purchases that led to these balances included over $175,000 in home goods and furnishings, $15,000 in jewelry, and $36,000 on night clubs and sporting events;

h) Issuing approximately $201,000 in checks to himself; and

i) Withdrawing approximately $215,000 in cash.

39. On or about December 10, 2010, MICHAEL SANG HAN, via an email sent across state lines to the District, forwarded a promissory note for the $20 million investment.

40. On or about July 26, 2011, Investor 1 sent an email from the District across state lines to MICHAEL SANG HAN requesting that the parties execute a single promissory note intended to cover the entire amount Investor 1 invested and that would replace all promissory notes that had been previously executed.

41. On or about August 4, 2011, MICHAEL SANG HAN and Investor 1 executed a global promissory note for $32,393,000.

**<u>COUNTS ONE AND TWO</u>**
**Wire Fraud**
**(18 U.S.C. § 1343)**

42. Paragraphs 1 through 41 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

43. Defendant MICHAEL SANG HAN, to execute the scheme to defraud and to obtain money described above, did cause to be transmitted in interstate commerce and foreign commerce, by means of wire communications, the following signals and sounds:

| Count | Approximate Date | Wire Communication |
|---|---|---|
| 1. | 10/25/2010 | Interstate facsimile from the District directing the transfer of $20 million to MICHAEL SANG HAN. |
| 2. | 12/10/2010 | Interstate email sent to the District forwarding a promissory note for the October 25, 2010, $20 million investment. |

**(Wire Fraud, in violation of Title 18, United States Code, Section 1343)**

**<u>COUNT THREE</u>**
**Securities Fraud**
**(15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5)**

44. Paragraphs 1 through 41 of this Indictment are realleged and incorporated by reference as if fully set forth herein.

45. From at least in or about March 2004 through at least in or about November 2011, in the District and elsewhere, defendant MICHAEL SANG HAN unlawfully, willfully and knowingly, by use of means and instrumentalities of interstate commerce and the mails, directly and indirectly did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of a security, in contravention of Rule 10b-5 (Title 17, Code of Federal Regulation, Section 240.10b-5) of the Rules and Regulations promulgated by

the United Sates Securities and Exchange Commission, and did (a) employ a device, scheme and artifice to defraud, (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engage in acts, practices and a course of business which would and did operate as a fraud and deceit upon persons in connection with the purchase and sale of Envion securities.

**(Securities Fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5)**

**COUNTS FOUR THROUGH NINE**
**Monetary Transactions in Property Derived from Specified Unlawful Activity**
**(18 U.S.C. § 1957)**

46. The allegations set forth in paragraphs 1 through 41 of this Indictment are realleged and incorporated by reference herein.

47. From at least in or about March 2004 through at least in or about November 2011, in the District and elsewhere, defendant MICHAEL SANG HAN knowingly engaged and attempted to engage in monetary transactions, further described below, in criminally derived property of a value greater than $10,000, which property was derived from a specified unlawful activity, that is, wire fraud.

| Count | Approximate Date | Monetary Transaction |
|---|---|---|
| 4. | 03/21/2011 | Purchased an approximately $3,096,678 home in Palm Beach, Florida |
| 5. | 03/23/2011 | Purchased a 2011 BMW 328i convertible for approximately $56,000 |
| 6. | 03/30/2011 | Purchased a 2008 Ferrari 430 Scuderi for approximately $226,000 |
| 7. | 07/26/2011 | Wired approximately $222,567.89 for home improvements |
| 8. | 08/02/2011 | Purchased a 2011 Range Rover for approximately $57,682 |
| 9. | 10/31/2011 | Wired approximately $200,000 for home improvements |

**(Monetary Transactions in Property Derived from Specified Unlawful Activity, in violation of Title 18, United States Code, Section 1957)**

**COUNT TEN**
**First Degree Fraud**
**(§§ 22-3221(a), 22-3222(a))**

48. The allegations set forth in paragraphs 1 through 41 of this Indictment are realleged and incorporated by reference herein.

49. From in or around February 2004 through in or around November 2011, in the District of Columbia, defendant MICAHEL SANG HAN engaged in a scheme and systematic course of conduct with intent to defraud and to obtain property of another by means of a materially false and fraudulent pretense, representation, and promise, and thereby obtained property of another of a value of $1,000 or more and caused another to lose property of a value of $1,000 or more, that is, approximately $20 million from Investor 1.

**(First Degree Fraud, in violation of D.C. Code, Sections 22-3221(a) and 22-3222(a) (2001 ed.))**

**CRIMINAL FORFEITURE ALLEGATION**

1. Upon conviction of the offenses alleged in Counts One through Three, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c). The United States will seek a forfeiture money judgment against the defendant of at least $39,898,000.

2. Upon conviction of the offense alleged in Counts Four through Nine, the defendant shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). The United States will seek a forfeiture money judgment against the defendant of at least $3,858,927.

3. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property that cannot be divided without difficulty;

it is the intention of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described above.

(**Criminal Forfeiture**, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).)

A TRUE BILL:

FOREPERSON

ATTORNEY FOR THE UNITED STATES IN
AND FOR THE DISTRICT OF COLUMBIA